**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

NESTLÉ PURINA PETCARE COMPANY,
      Plaintiff/ Counterclaim Defendant,

             v.

BLUE BUFFALO COMPANY LTD.
      Defendant/ Counterclaim Plaintiff.

Case No. 4:14-CV-00859 (RWS)

**FILED UNDER SEAL**

**BLUE BUFFALO'S MEMORANDUM OF LAW IN OPPOSITION TO NESTLÉ
PURINA'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

7393097v.1

## TABLE OF CONTENTS

**Page**

I.    DOCUMENTS RELATING TO THE NAD'S 2008 AND 2014 DECISIONS
      HAVE NO BEARING ON THIS CASE (NESTLÉ PURINA REQUESTS
      5(IV), 48 AND 49)..............................................................................................1

      A.    The 2008 NAD Proceedings Are Irrelevant..............................................2

      B.    The 2014 NAD Proceedings Are Equally Irrelevant ................................4

      C.    Nestlé Purina's Intended Use of the NAD Proceedings Is Contrary to Law
            and NAD Procedure ..................................................................................5

      D.    Request 5(iv) Extends Well Beyond NAD Proceedings...........................9

II.   NESTLÉ PURINA HAS PROVIDED NO BASIS FOR SEEKING
      DISCOVERY REGARDING LEONARD BRENNAN (REQUEST 21)..........................9

III.  NESTLÉ PURINA CANNOT EXPAND THE SCOPE OF ITS LAWSUIT
      THROUGH DOCUMENT REQUESTS UNTETHERED TO ITS
      COMPLAINT (GENERAL OBJECTION 8) ......................................................9

IV.   NESTLÉ PURINA SHOULD NOT BE GRANTED ACCESS TO BLUE
      BUFFALO'S TOP SECRET PRODUCT FORMULAE (GENERAL
      OBJECTION 7) .....................................................................................12

V.    NESTLÉ PURINA HAS IDENTIFIED NO BASIS FOR SEEKING
      DETAILED INFORMATION ON BLUE BUFFALO OWNERSHIP
      (REQUEST 4).......................................................................................14

VI.   NESTLÉ PURINA'S DEMAND FOR UNREDACTED STRATEGIC
      DOCUMENTS IS UNSUPPORTED AND PREMATURE (REQUEST 34)...................15

CONCLUSION......................................................................................15

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ALPO Petfoods v. Ralston Purina Co.*,
    913 F.2d 958 (D.C. Cir. 1990) .......................................................................7

*Bair v. Callahan*,
    664 F.3d 1225 (8th Cir. 2012) .......................................................................6

*Bakhtiaria Corp. v. Register Tapes Unlimited, Inc.*,
    12-cv-05183, 2013 WL 2253182 (N.D. Cal. May 22, 2013)..........................7

*Batiste-Davis v. Lincare, Inc.*,
    526 F.3d 377 (8th Cir. 2008) .........................................................................6

*Bell v. Hershey Co.*,
    557 F.3d 953 (8th Cir. 2009) .........................................................................1

*Hartman v. Remington Arms Co.*,
    143 F.R.D. 673 (W.D. Mo. 1992) ...............................................................13

*Int'l Bottled Water Ass'n v. Eco Canteen, Inc.*,
    No. 3:09-cv-299-RJC-DSC, 2010 U.S. Dist. LEXIS 102381 (W.D.N.C. Sept.
    17, 2010) .........................................................................................................8

*In re Remington Arms Co.*,
    952 F.2d 1029 (8th Cir. 1991) .....................................................................12

*Rexall Sundown, Inc. v. Perrigo Co.*,
    651 F. Supp. 2d 9 (E.D.N.Y. 2009) ...............................................................7

*Standard Fire Ins. Co. v. Knowles*,
    133 S. Ct. 1345 (2013)....................................................................................1

*United States v. Crenshaw*,
    359 F.3d 977 (8th Cir. 2004) .........................................................................6

*United States v. Dish Network*,
    2011 WL 98951 (C.D. Ill.).............................................................................8

**Other Authorities**

21 C.F.R § 501.100(a)(3) ....................................................................................11

Fed. R. Civ. P. 26(c)(1)(G) .................................................................................12

Fed. R. Evid. 404(b).............................................................................................6

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

Fed. R. Evid. 407 ................................................................................................................7

Blue Buffalo submitted a preliminary response earlier this week to Nestlé Purina's statements regarding documents produced by non-party Wilbur-Ellis.[1]  Blue Buffalo now addresses the six categories of document requests as to which Nestlé Purina moves to compel.

Nestlé Purina argues that the discovery it seeks is justified because, "As the saying goes, 'plaintiff is the master of his claims.'"  (Nestlé Purina Br. at 2).[2]  Nestlé Purina provides no citation for this supposed truism, and with good reason:  Nestlé Purina has it wrong.  The correct adage is that "plaintiff is the master of the **complaint**."  *See, e.g., Bell v. Hershey Co*., 557 F.3d 953, 956 (8th Cir. 2009) (emphasis added), *abrogated on other grounds by Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345 (2013).  Had Nestlé Purina actually alleged the claims it now pretends are lurking somewhere in the shadows of its amended complaint, Blue Buffalo would have moved to dismiss them as mere conclusory allegations with no factual basis.  Nestlé Purina cannot now vastly expand the scope of this action—and, with it, the bounds of permissible discovery—by falsely insisting that it has put at issue claims that are nowhere to be found in its operative pleading.

## I.    Documents Relating to the NAD's 2008 and 2014 Decisions Have No Bearing on This Case (Nestlé Purina Requests 5(iv), 48 and 49)

Nestlé Purina seeks to compel the production of "all documents" relating to the 2008 and 2014 NAD decisions involving Blue Buffalo.  Nestlé Purina submits that "the issues in the NAD proceedings are substantially similar to the issues" in this case and that the NAD's "findings are nearly identical to certain of Purina's allegations in this lawsuit."  (Nestlé Purina Br. at 6-7). These assertions are incorrect.

---

[1] Nestlé Purina has since expanded its campaign to mischaracterize the Wilbur-Ellis documents into the public domain.  (*See* Ex. 1).  All exhibits cited herein are attached to the supporting declaration of Adeel A. Mangi dated October 17, 2014.

[2] Nestlé Purina Br. refers to "Purina's Motion to Compel Blue Buffalo's Production of Documents and Memorandum in Support Thereof" dated October 10, 2014.

1

A.      The 2008 NAD Proceedings Are Irrelevant

In the 2008 NAD proceedings, Hill's Pet Nutrition ("Hill's") challenged Blue Buffalo's

claim that Blue Buffalo products included "no animal by-products."  (*See* Ex. 2).  Hill's focused

on Blue Buffalo's use of fish meal and lamb meal and on its use of liver in wet (canned) pet

foods.  It was undisputed that fish meal is made from whole fish and that lamb meal is made with

various parts of the lamb including intestines.  (*Id.* at 2).  Hill's argued that Blue Buffalo's

products therefore included "by-products."  (*Id.* at 2-3).  Blue Buffalo argued that the

Association of American Feed Control Officials ("AAFCO") defined fish and lamb meals

separately from by-product meals and that the liver it used was not a by-product.  Blue Buffalo

also noted that its packaging had been approved by state regulators.  (*Id.* at 7-9).

The NAD ultimately recommended that Blue Buffalo discontinue its use of "no animal

by-products" based on its view of how consumers could interpret the claim.  (*Id.* at 9-12).  After

pursuing its appellate rights, Blue Buffalo implemented the NAD recommendation.  Blue

Buffalo discontinued the "no animal by-products" claim and moved instead to a narrower claim

of "no chicken by-product meals," which is the claim at issue here.  (*Id.* at 15-16).

Hill's also presented two other challenges.  First, Hill's challenged a Blue Buffalo ad that

included the phrase:  "Because the leading pet foods did not meet our standards, we developed a

two-part product that combined a nutritious kibble with our exclusive LifeSource Bits . . . ."  (*Id.*

at 3-4).  The NAD agreed with Hill's that this was a comparative nutrition claim.  It then

examined nutritional data for Hill's and Blue Buffalo products, including calcium and

phosphorous levels, before recommending that the claim be discontinued because "the advertiser

did not have a reasonable basis for the superiority message arising from the 'meet our standards'

claim."  (*Id.* at 13).  Blue Buffalo complied.

2

Hill's also challenged certain claims involving phrases like "feed your pet like you feed your family" on the grounds that Blue Buffalo pet foods did not meet FDA standards for human consumption. (*Id.* at 4). The NAD recommended that certain variants on the message be discontinued, but upheld Blue Buffalo's use of the phrase in a print advertisement based on its specific context and content. (*Id.* at 14). Blue Buffalo agreed to take the NAD recommendations into account in future advertising. (*Id.* at 16).

None of the issues before the NAD in 2008 are present here. The gravamen of Nestlé Purina's complaint and ad campaign is that "Blue Buffalo's brand is built . . . on a platform of dishonesty and deception" because it deliberately includes poultry by-product meal in its products while claiming that it does not. (See Ex. 3, Nestlé Purina First Amended Complaint ¶ 1). The fish meal and lamb meal upon which the 2008 NAD proceedings focused are not at issue here, nor is the use of liver in wet pet food. Indeed, the words "fish," "lamb" and "liver" appear in Nestlé Purina's First Amended Complaint only in sections where it is recounting the 2008 NAD proceeding. (*See* Ex. 3).

Blue Buffalo's pre-2008 claim regarding whether competitors "meet our standards" is similarly not at issue here. Nestlé Purina argues that it disputes a different Blue Buffalo claim to "superior nutrition"—not at issue in the 2008 NAD proceeding—that, according to Nestlé Purina, raises similar issues. But Blue Buffalo's "superior nutrition" claim merely refers to the product's high quality. It is not a comparative claim. And Nestlé Purina's allegations here assert that the "superior nutrition" claim is false specifically because of the alleged use of poultry by-product meal.[3] The same is true of Nestlé Purina's passing mention in its Complaint of "Love

---

[3] *See*, *e.g.*, Ex. 3, ¶¶ 20, 22 ("Blue Buffalo's 'superior nutrition' claims are premised in part on its assertion that its products do not contain certain ingredients such as chicken/poultry by-product meals . . . Blue Buffalo cannot distinguish its products as allegedly 'superior' over competitive products for not having chicken/poultry by-product meals as the testing reveals that its products contain this precise ingredient").

3

them like family.  Feed them like family."[4]  This bears no connection to the issues in the 2008 NAD proceedings.

Nestlé Purina's claims relating to the 2008 NAD proceedings are also irrelevant for another reason:  they are outside the relevant time period.  Nestlé Purina itself has objected to producing documents dated prior to May 6, 2009 based on the applicable statute of limitations, and has stated that "Purina will only produce documents dated on or after May 6, 2009."  (*See* Ex. 4, at 3).  The same standard should apply to the discovery it seeks from Blue Buffalo.

**B.     The 2014 NAD Proceedings Are Equally Irrelevant**

Nestlé Purina fares no better with its claims relating to the 2014 NAD proceedings, which again involved Hill's.  Hill's objected to Blue Buffalo ads it characterized as conveying that "big name" pet food manufacturers were actively trying to conceal the fact that they include chicken by-product meal as their first ingredient.  (Ex. 5, at 2-3).  Hill's also objected to specific aspects of Blue Buffalo's then-current True Blue brand comparison tool, which is no longer in use.  (*Id.* at 3-4).  For example, at the time, the True Blue test had a column for "NEVER Has Chicken (or Poultry) By-Product Meal" in which it provided a check for Blue Buffalo (because none of its products include that ingredient), but not Hill's (because some of its products do).[5]  Hill's argued that this was misleading because it had a number of products that did not include by-product meals.  Hill's also objected to both the prominence and method of appearance of the disclaimers explaining the nature of the comparison, as well as the color and prominence of the check marks used.  (*Id.*)  Blue Buffalo argued that its ads accurately depicted consumer reactions to discovery

---

[4] *See id.* ¶ 43 ("Blue Buffalo's statements that its products are human-grade and/or fit for human consumption are materially false because Blue Buffalo's products contain ingredients such as chicken/poultry by-product meals that are not human grade.")

[5] Notably, Nestlé Purina today uses an almost identical brand comparison tool for its own premium Beyond product, complete with the use of the word "NEVER' and different color check marks.  (*See* Ex. 6).

4

of the ingredients of big name pet foods and that the nature of the True Blue comparison across brands was clear and fully disclosed.  (*Id.* at 5-6).

NAD ultimately "recommended that the advertiser modify the challenged advertisements to avoid any express or implied references to competing manufacturers 'fooling' or otherwise misleading consumers" because their products include by-product meals.  (*Id.* at 14).  NAD also recommended a variety of modifications to the True Blue test, including specifying how many products included ingredients at issue, modifying the format and method of appearance of the disclosures, and changing the color and prominence of the check marks.  (*Id.* at 14).

Like the 2008 proceedings, these 2014 NAD proceedings are irrelevant here.  No claims about big name pet companies "fooling" consumers are at issue.  Nor is the nature of the comparison in the True Blue test.  While Nestlé Purina does mention the True Blue test in its complaint, its only allegation of falsity relates to the alleged presence of poultry by-product meal in Blue Buffalo products.[6]  There is no overlap between the issues here and the issues that were before the NAD.

### C.  Nestlé Purina's Intended Use of the NAD Proceedings Is Contrary to Law and NAD Procedure

Nestlé Purina's real intentions with regard to the NAD proceedings are apparent:  Nestlé Purina seeks to tar Blue Buffalo as a bad actor that serially engages in false advertising.  Even in its Complaint, Nestlé Purina introduces the NAD proceedings stating that Blue Buffalo "has been no stranger to legal disputes centered on its deceptive advertising practices."  (Ex. 3, ¶ 44).  And it describes the NAD proceedings on its smear website www.petfoodhonesty.com under the heading "some facts we'd like you to know." (Ex. 1, at 4).

---

[6] *See* Ex. 3, ¶ 26 ("Among other claims, the 'True Blue test' falsely advocates that Blue Buffalo's products 'Never Has chicken or Poultry By-Product Meals' and identifies competing leading brands that, by Blue Buffalo's assessment, do.  These statements are materially false because Blue Buffalo products, as tested, contain chicken/poultry by-product meals—in significant amounts.").

5

Nestlé Purina's approach runs afoul of the Federal Rules of Evidence.  Rule 404(b) states that "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  That is precisely what Nestlé Purina seeks to do here.  The rule does go on to state that such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  (*Id.*)  But Nestlé Purina has articulated no such other purpose here.  At best, it suggests that this evidence is relevant to the "willfulness of Blue Buffalo's conduct," (s*ee* Nestlé Purina Br. at 7), but that is a non-starter given the differences in the claims at issue.  The NAD's findings have no bearing on whether Blue Buffalo engaged in willful wrongdoing by deliberately using chicken by-product meal, and the Wilbur-Ellis documents touted by Nestlé Purina only confirm that it did not.  Accordingly, the NAD decisions cannot provide a "good faith basis for [] Purina's" false statements about Blue Buffalo.  (*Id.* at 8).  Those decisions have no relevance to whether Nestlé Purina had a good faith basis for claiming that Blue Buffalo engaged in dishonest and deliberate use of poultry by-product meal, which is what Nestlé Purina has claimed.

The Eighth Circuit agrees.  It has "interpreted Rule 404(b) as permitting evidence of prior acts if it is (1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to [the event at issue]."  *See Bair v. Callahan*, 664 F.3d 1225, 1228-29 (8th Cir. 2012) (internal citations omitted).  All four factors must be satisfied.  *See United States v. Crenshaw*, 359 F.3d 977, 1000-01 (8th Cir. 2004) ("The [404(b)] test has four parts, not one. . . . Indeed, it would make little sense to recite a four-part test under Rule 404(b) if our review of the admissibility of prior [bad act] evidence was governed solely by its relevance.");  *see also Batiste-Davis v.*

6

*Lincare, Inc.*, 526 F.3d 377, 380 (8th Cir. 2008) ("Evidence of a prior lawsuit may be admitted on a case-by-case basis if it meets the four requirements of this circuit's test.").

Here, none of the four factors can be satisfied.  The NAD proceedings are not "similar in kind" for the reasons detailed above.  To the extent Nestlé Purina argues that *any* prior advertising conduct is relevant, that is a recipe for burdensome discovery on all sides.[7]  The prejudicial nature of Nestlé Purina's intended use of the NAD proceedings is apparent from its use of them in its complaint and on www.petfoodhonesty.com.  The 2008 proceedings are not "close in time."  The NAD rulings themselves are not admissible in evidence.  *See Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 36 (E.D.N.Y. 2009) (NAD decisions are inadmissible hearsay).  And while Nestlé Purina has said that it "intend[s] to prove that Blue Buffalo changed its advertising because it was false," (Ex. 10, at 5), this approach is barred by Federal Rule of Evidence 407, which provides that "evidence of [such] subsequent [remedial] measures is not admissible to prove . . . culpable conduct."  Given these facts, Nestlé Purina's demands for discovery regarding NAD proceedings are not reasonably calculated to lead to the discovery of admissible evidence.

The cases Nestlé Purina cites are not to the contrary.  *Bakhtiaria Corp. v. Register Tapes Unlimited, Inc.* was a contract case, not an advertising case, in which the defendant had put its own knowledge of similar claims at issue.  As such, the court ordered production of documents relating to defendant's correspondence with the Better Business Bureau, because plaintiff could

---

[7] Nestlé Purina has itself had numerous skirmishes before the NAD, some of which have resulted in findings against Nestlé Purina.  (*See, e.g.*, Ex. 7 (2005 NAD recommendation that Nestlé Purina narrow challenged claim); Ex. 8 (2007 NAD ruling that certain Nestlé Purina claims were misleading)).  Courts have similarly held that Nestlé Purina has engaged in "false and deceptive" advertising.  *See*, *e.g.*, *ALPO Petfoods v. Ralston Purina Co.*, 913 F.2d 958, 962 (D.C. Cir. 1990).  Nestlé Purina's parent corporation has even received a recent "award" from a consumer group for notable false advertising in relation to its baby food products.  (*See* Ex. 9).  Nestlé Purina would no doubt contend that discovery relating to its own prior false advertising is irrelevant.  It applies a different standard, however, to Blue Buffalo.

7

use such information "to rebut [defendant's] claim of a 'good faith mistake.'  No. 12-cv-05183, 2013 WL 2253182, at *3 (N.D. Cal. May 22, 2013).  *United States v. Dish Network L.L.C.* similarly has nothing to do with false advertising.  In that case, the federal government (along with various states) alleged that Dish Network violated various telemarketing laws (*e.g.*, the National Do Not Call Registry), and sought documents relating to complaints to consumer protection agencies (such as the Better Business Bureau).  The court ordered their production because "Dish's involvement with consumer complaint entity [*sic*] regarding violations of telemarketing laws is relevant to the issue of knowledge and intent."  No. 09-cv-3073, 2011 U.S. Dist. LEXIS 2200, at *22 (C.D. Ill. Jan 10, 2011).  Again, this has no bearing here.

Discovery of submissions to and internal communications concerning NAD proceedings also runs contrary to the spirit of the NAD process.  NAD's own rules make the proceedings confidential.  *See* NAD/CARU/NARB Rule 2(E)(i) ("NAD/CARU/NARB proceedings are confidential" except for the final decision, press releases, government referrals, and certain other actions taken by the NAD/CARU/NARB); *see also id.* Rule 2(E)(iii) (participants agree to "keep the proceedings confidential throughout the review process"), *available at* http://www.asrcreviews.org/wp-content/uploads/2012/04/NAD-CARU-NARB-Procedures-revised-1.-1.-141.pdf.  NAD bills itself as providing a "private process" wherein "NAD keeps confidential all data it receives in reviewing a case."  (*See* Ex. 11).  Furthermore, "[t]he NAD rules and procedures forbid a party from publicizing a challenge or attempting to use the outcome of a NAD challenge for a competitive advantage."  *Int'l Bottled Water Ass'n v. Eco Canteen, Inc.*, No. 3:09-cv-299-RJC-DSC, 2010 U.S. Dist. LEXIS 102381, at *3 (W.D.N.C. Sept. 17, 2010) (referencing NAD/CARU/NARB Rule 2.1(F)(ii)).

Finally, the NAD decisions themselves are a matter of public record.  Nestlé Purina can make whatever arguments it chooses based upon them.  It has no legitimate need for "all

documents" containing any mention of the NAD decisions.

### D.      Request 5(iv) Extends Well Beyond NAD Proceedings

Nestlé Purina's brief addresses only NAD proceedings, but it moves to compel on Request 5(iv), which seeks documents dating back to 2004 "discussing any pending or threatened litigation, administrative actions (including NAD proceedings) or like claims relating to the Blue Buffalo products." Nestlé Purina does nothing to justify the obviously overbroad scope of this request. Indeed, when served with a mirror request, Nestlé Purina flatly refused to produce any documents at all. (Ex. 4). Nestlé Purina cannot have it both ways.

## II.    Nestlé Purina Has Provided No Basis for Seeking Discovery Regarding Leonard Brennan (Request 21)

Nestlé Purina seeks invasive discovery regarding one individual Blue Buffalo employee: Leonard Brennan, who is a manager within Blue Buffalo's procurement department. Nestlé Purina apparently believes that Mr. Brennan has engaged in misconduct. Blue Buffalo has no reason to think that is true, but informed Nestlé Purina that it will consider these requests if Nestlé Purina will explain what it thinks Mr. Brennan did wrong and identifies the source or bases for its suspicions. Nestlé Purina has refused. Nestlé Purina's brief includes ominous speculation about whether Mr. Brennan was somehow "incentivized" to ensure that Blue Buffalo got the chicken meal it paid for, but Nestlé Purina provides no specifics regarding this claim. Nestlé Purina should not be permitted to engage in an extensive fishing expedition relating to an individual employee, including his compensation, without identifying a basis for doing so.

## III.   Nestlé Purina Cannot Expand the Scope of its Lawsuit Through Document Requests Untethered to its Complaint (General Objection 8)

Blue Buffalo's General Objection 8 objects to Nestlé Purina's discovery to the extent it concerns ingredients other than those at issue, even upon an expansive reading of Nestlé Purina's complaint (*i.e.*, ingredients other than poultry by-product meal, corn, rice or rice hulls and the

nutrients in Life Source bits). These limitations are imperative, because Blue Buffalo uses a

wide range of ingredients that have no conceivable connection to this case. (*See* Ex. 12). Nestlé

Purina objects to such limitations and complains that Blue Buffalo has refused to produce

documents responsive to three narrowed categories to the extent they implicate ingredients

beyond those at issue (*see* Nestlé Purina Br. at 10):

- All documents and communications related to preservatives or any ingredient related to preservatives or any ingredient used to give any Blue Buffalo dry pet food a specific color or flavor.

- All documents and communications relating to any testing or other quality control measures performed or undertaken to ensure conformity with Blue Buffalo's ingredient and product specifications.

- All documents sufficient to show the identity of Blue Buffalo's suppliers, distributors and brokers.[8]

Again, however, Nestlé Purina can provide no rational explanation for why Blue

Buffalo's use of ingredients not at issue (*e.g.*, carrots or peas) has any bearing here, much less

why Nestlé Purina needs the burdensome production of "all documents" relating to any

ingredient used for flavor or "all documents" regarding any testing or quality control relating to

any ingredients. Nor can it identify any reason why it needs to know who supplies Blue

Buffalo's carrots or peas, among dozens of other ingredients. Nestlé Purina's only justification

---

[8] In pre-motion correspondence, Nestlé Purina identified these narrowed categories as replacing its original requests 16, 17, 22 and 24. Nestlé Purina's brief now indicates that these narrowed categories also now encompass its original requests 7, 9, 10, 11 and 50. (*See* Nestlé Purina Br. at 9-10). Appendix A to Nestlé Purina's motion, however, does not reflect similar narrowing. To the extent Nestlé Purina seeks documents responsive to requests 7, 9, 10, 11 and 50 other than the narrowed categories, Blue Buffalo has significant additional objections to aspects of these demands as detailed in its written responses. (Ex. 13). In short, these "all documents" requests are hugely burdensome and seek irrelevant information. Requests relating to Blue Buffalo's "superior nutrition" claim and the "true blue test" are irrelevant because Nestlé Purina only challenges them in relation to by-product meal. (Requests 7 and 11). Production of "all documents" on testing, sampling and quality assurance relating to irrelevant ingredients is similarly unreasonable. (Requests 9 and 10). And Blue Buffalo objects to the burdensome production of "all documents" on product recalls unrelated to any issue in this case, including pre-2009 recalls, and notes that Nestlé Purina has itself refused to produce documents on its own product recalls. (Request 50). (*See* Ex. 4). Blue Buffalo has agreed to produce responsive documents to the extent they relate to relevant ingredients or issues.

is that it has challenged claims relating to "superior nutrition" or "feed them like family."  But as discussed above, Nestlé Purina's Complaint bases its assertion that these claims are false or misleading solely upon the alleged presence of poultry by-product meal in Blue Buffalo products.  Nestlé Purina cannot stretch those allegations to justify production of virtually every document at Blue Buffalo relating to irrelevant ingredients.

Finally, lacking any other justification, Nestlé Purina falls back to the Wilbur-Ellis documents.  It contends that one Wilbur-Ellis email suggests Wilbur-Ellis chicken meal "contains soy," whereas Blue Buffalo claims its products do not include soy.  Nestlé Purina thus asserts that is "entitled to explore just how far Blue Buffalo's mislabeling goes." (Nestlé Purina Br. at 11).  But Nestlé Purina's Complaint makes no allegations relating to soy.  Moreover, the Wilbur-Ellis email cited by Nestlé Purina confirms that Blue Buffalo's specifications require no soy.  (Nestlé Purina Ex. E, at WE 00306).  And, on its face, the Wilbur-Ellis email suggests only that a particular supplier uses soy after removal of allergy-causing proteins to create another product (lecithin), which in turn is used to make a natural preservative, which in turn is added at low levels to Blue Buffalo products.  Even if Wilbur-Ellis' account is accurate, none of this constitutes mislabeling by Blue Buffalo,[9] let alone justifies wide-ranging discovery into carrots, peas and dozens of other ingredients.

---

[9] Federal regulations specifically exempt such trace derivative elements from labeling requirements.  Specifically, 21 C.F.R. § 501.100(a)(3) exempts from the labeling requirements of animal food "[i]ncidental additives that are present in a food at insignificant levels and do not have any technical or functional effect in that food."  These additives are defined to include "[s]ubstances that have no technical or functional effect but are present in a food by reason of having been incorporated into the food as an ingredient of another food, in which the substance did not have a functional or technical effect," and "processing aids," which include "[s]ubstances that are added to a food for their technical or functional effect in the processing but are present in finished food at insignificant levels and do not have any technical or functional effect in that food." *Id.* § 501.100(a)(3)(i), (ii)(c).

11

IV.    **Nestlé Purina Should Not Be Granted Access to Blue Buffalo's Top Secret Product Formulae (General Objection 7)**

Blue Buffalo has agreed to produce documents showing its ingredients and any documents relating to poultry-by product meal.  Nestlé Purina, however, objects to Blue Buffalo's redaction of its product formulae to remove the exact percentages of each ingredient. Nestle Purina does not dispute that these formulae are trade secrets.  Nor can it.  As the FDA has recognized, "Trade secrets include such things as a company's . . . precise product formulations." (Ex. 14).[10]

The Federal Rules contemplate that courts can issue protective orders to "requir[e] that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Fed. R. Civ. P. 26(c)(1)(G).  In the Eighth Circuit, once the party opposing discovery on the ground that a document contains a trade secret shows that the information in fact constitutes a trade secret whose disclosure would be harmful, "[t]he burden then shifts to the party seeking discovery to show that the information is relevant to the subject matter of the lawsuit and is necessary to prepare the case for trial."  *In re Remington Arms Co.*, 952 F.2d 1029, 1032 (8th Cir. 1991).  If the party seeking discovery shows both relevance and need, the court must weigh the injury that the disclosure might cause to the party seeking to prevent disclosure against the moving party's need for the information.  *Id.*  However, "[i]f the party seeking discovery fails to show the relevance of the requested information and the need for the material in developing its case, *there is no reason for the discovery request to be granted, and the trade secrets are not to be revealed.*"  *Id.* (emphasis added).

---

[10] As Nestlé Purina acknowledges "the Eighth Circuit has 'recognized and approved the general rule that a trade secret consists of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'"  Nestlé Purina's Reply in Support of Motion for Leave to File Documents Under Seal at 4, Dkt. #54 (quoting *Hulsenbusch v. Davidson Rubber Co.*, 344 F.2d 730, 734 (8th Cir. 1965)).

For example, in *Hartman v. Remington Arms Co.*, 143 F.R.D. 673 (W.D. Mo. 1992), plaintiffs sought documents from a defendant gun manufacturer.  Defendants sought an order that they could withhold the documents, in part on the basis that they were highly sensitive trade secrets relating to a new rifle that was in development.  While the court concluded that some documents related to the rifle that was in development should be produced because the protective order in the case was able to satisfy the defendant's trade secret concerns, the court held that "[s]ome of the documents are entitled to absolute protection because they feature the actual designs" for the product.  *Id.* at 678.

Here, the parties are direct competitors.  Nestlé Purina has made numerous forays into Blue Buffalo's premium market space and is currently attempting to penetrate that sector with its Beyond product line.  Blue Buffalo has significant concerns about sharing its product formulae with Nestlé Purina or its representatives.  The Protective Order provides some measure of protection, but Blue Buffalo should not be obliged to hand over its most confidential materials, especially when those materials bear little or no relevance to the issues in this case.  Indeed, Nestlé Purina has itself made clear it will not produce all of its product formulae to Blue Buffalo regardless of the Protective Order.  (*See* Nestlé Purina Br. at 13).

Nestlé Purina has asserted three specific bases for challenging Blue Buffalo's redaction or withholding of these trade secret materials.  *First*, Nestlé Purina contends Blue Buffalo put these formulae at issue by contending that none of them call for inclusion of by-product meal or corn.  (*Id.* at 12).  But the absence of these ingredients will be apparent on the face of the redacted formulae showing all ingredients used.  The exact percentages in the formulae of the ingredients that *were* used has no bearing on what ingredients *were not* used.

*Second*, Nestlé Purina contends that it needs the precise formulae to "provide insight" into Dr. Makowski's analysis, and that they "are necessary" to interpret his tests.  Dr. Makowski,

13

however, had no apparent difficulty completing his tests without these formulae, and Nestlé Purina had no hesitation about running a national ad campaign based upon that work.  Moreover, to the extent Nestlé Purina wishes to compare the percentages of each ingredient estimated by Dr. Makowski to Blue Buffalo's formulae, Blue Buffalo has offered to produce information regarding ingredient inclusions in bands, *e.g.* ingredient X is included at a rate of 3-5% (*see id.* 12-13), which would permit Nestlé Purina to make any comparison it wishes.  Nestlé Purina says this is "insufficient" to "adequately analyze the nutritional content of the formulas," (*see id.* at 13), but it does not explain why that is so—nor does it explain why any such analysis would be relevant in the first place.

*Third*, Nestlé Purina contends that product formulae are relevant to "Blue Buffalo's sweeping claims that its products are nutritionally superior to other products."  (*id.* at 12).  But Blue Buffalo makes no such comparative claims and, as detailed above, Nestlé Purina's allegations in this case are all based on the alleged inclusion of poultry by-product meal.  The exact rates at which irrelevant ingredients, such as peas, carrots, alfalfa, barley or flaxseed, are used by Blue Buffalo has no relevance to any of Nestlé Purina's claims.

## V. Nestlé Purina Has Identified No Basis for Seeking Detailed Information On Blue Buffalo Ownership (Request 4)

Blue Buffalo is privately owned.  Nestlé Purina seeks sensitive information detailing its entire ownership structure.  Nestlé Purina's justification is that it wishes to challenge Blue Buffalo's claim that it was launched as a family company.  (*Id.* at 13).  To moot this issue, Blue Buffalo agreed to produce information showing the company's top three shareholders at its launch and today.  Nestlé Purina, however, is still not satisfied.

Nestlé Purina now contends that it needs to know all of Blue Buffalo's owners, even those with fractional shares, and to know each of their financial and management rights, because these "bear on whether Blue Buffalo truly is a family-owned and operated business, as Blue

14

Buffalo implies in its Counterclaim." (*Id.* at 14).  Blue Buffalo, however, makes no such claim.
In the counterclaim paragraphs cited by Nestlé Purina, Blue Buffalo states only that it was
"launched as a family company" and "founded in 2002 by Bill Bishop and his two sons," not that
it remains an entirely family-owned company today.  And Blue Buffalo has offered discovery
that will establish its origins and its current majority ownership.  Nestlé Purina's desire to obtain
an inside view of its competitor's ownership structure is not warranted by any issue in this case.

**VI.    Nestlé Purina's Demand for Unredacted Strategic Documents Is
         Unsupported and Premature (Request 34)**

Nestlé Purina seeks a broad collection of Blue Buffalo's most sensitive business
documents, including strategic, long-range and business plans, to the extent that they mention
Nestlé Purina or its products.  Blue Buffalo agreed to produce responsive documents subject to
one condition:  Blue Buffalo reserves the right to redact competitively sensitive sections of these
documents that do not relate to Nestlé Purina or its products or any issue in this litigation.  Nestlé
Purina has articulated no coherent justification for seeking to rummage through sections of Blue
Buffalo's most sensitive business documents that have absolutely no bearing on any party or
issue in this lawsuit.

In any event, Nestlé Purina's motion is premature.  Blue Buffalo agreed to meet and
confer with Nestlé Purina about whether and how any redactions might be logged.  And Blue
Buffalo noted that, because these documents have not yet been produced, it is not yet clear
whether and to what extent any redactions will be required.  Nestlé Purina, however, insisted on
presenting this issue to the Court now.  Given the lack of any dispute ripe for resolution, Nestlé
Purina's motion should be denied.

## CONCLUSION

For the foregoing reasons, Nestlé Purina's motion to compel should be denied.

Dated:  October 17, 2014
New York, New York

Respectfully submitted,


By:   /s/ Steven A. Zalesin
        Steven A. Zalesin, Lead Counsel (pro hac vice)
        Adeel A. Mangi (pro hac vice)
        Vivian Storm (pro hac vice)
        Frank A. Cavanagh (pro hac vice)
        PATTERSON BELKNAP WEBB & TYLER LLP
        1133 Avenue of the Americas
        New York, NY 10036-6710
        Telephone: 212-336-2000
        Facsimile: 212-336-2222

        Martin Flumenbaum (pro hac vice)
        Robert Atkins (pro hac vice)
        PAUL, WEISS, RIFKIND, WHARTON &
        GARRISON LLP
        1285 Avenue of the Americas
        New York, NY  10019-6064
        Telephone: 212-373-3000
        Fax: 212-757-3990

        Gerard T. Carmody, # 24769
        David H. Luce, # 36050
        Sarah J. Bettag, # 60849
        CARMODY MACDONALD P.C.
        120 S. Central Avenue
        Suite 1800
        St. Louis, MO 63105
        Telephone: 314-854-8600
        Fax: 314-854-8660

        Of counsel:
        Richard MacLean, Esq.
        Blue Buffalo Company Ltd.

        *Attorneys for Defendant Blue Buffalo Company
        Ltd.*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2014, I caused the foregoing to be served by

email on the following counsel of record:

Carmine R. Zarlenga
MAYER BROWN LLP
1999 K Street
Washington, DC 20006
czarlenga@mayerbrown.com

Richard M. Assmus
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
rassmus@mayerbrown.com

Kristine M. Young
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
kyoung@mayerbrown.com

David A. Roodman
BRYAN CAVE LLP
211 North Broadway #3600
St. Louis, Missouri 63102
daroodman@bryancave.com

Emma Harty
BRYAN CAVE LLP
211 North Broadway #3600
St. Louis, Missouri 63102
emma.harty@bryancave.com

By: /s/ Vivian Storm

7393097v.1