NESTLÉ PURINA PETCARE COMPANY,      )
                                    )
    Plaintiff/Counterclaim Defendant,      )
                                    )
    vs.      )      Case No.  4:14 CV 859 RWS
                                    )
THE BLUE BUFFALO COMPANY LTD.,      )
                                    )
    Defendant/Counterclaim Plaintiff,      )
_____
                                    )
AND RELATED ACTIONS      )
_____

## MEMORANDUM AND ORDER

This false advertising pet food case is before me on two motions to dismiss Diversified Ingredients' crossclaims and third-party complaint: Wilbur-Ellis Company, William Haning, Oliver Harwell, and Henry Rychlik's motion to dismiss Diversified Ingredients' crossclaims, and Custom Ag and Troy Geraci's motion to dismiss Diversified Ingredients' third party claims.  The motions are fully briefed and ready for review.  After careful consideration, I will grant in part and deny in part the motions to dismiss.

## Background

Plaintiff Nestle Purina Petcare Company brought this case against The Blue Buffalo Company, alleging that Blue Buffalo falsely advertises its pet foods as free of poultry by-product meal and meeting other nutritional claims in violation of the Lanham Act, 15 U.S.C. § 1125.  Blue Buffalo has since admitted that poultry by-product was in some of its pet foods.  However, it claims that its ingredient supplier, Wilbur-Ellis, and ingredient broker, Diversified Ingredients, deceived Blue Buffalo when they sold it by-product meal instead of high quality chicken and

turkey meal.  Blue Buffalo brought third-party claims for indemnity and contribution against Wilbur-Ellis and Diversified, alleging that they are liable to it for any harm Blue Buffalo is found to have committed against Purina, as well as for additional damages under other legal theories.

After being named as a third-party defendant, Diversified brought its own crossclaims against Wilbur-Ellis and third-party claims against Wilbur-Ellis' current or former employees William Haning, Oliver Harwell, and Henry Rychlik ("Wilbur-Ellis Defendants").  Diversified also brought third-party claims against Custom Ag and its employee Troy Geraci ("Custom Ag Defendants").  Custom Ag is also an ingredient broker, and brokered the sale of the poultry by-product meal at-issue between Wilbur-Ellis and Diversified (and ultimately, Blue Buffalo).  Diversified brings claims against the Wilbur-Ellis and Custom Ag Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1962(d), 1964(c), as well as various claims for breach of contract, fraud, and violations of other state trade and consumer protection laws.

The Wilbur-Ellis and Custom Ag Defendants have both filed motions to dismiss Diversified's crossclaims and third-party complaint ("Complaint") as it pertains to each of them.[1] For the reasons that follow, I will grant in part and deny in part both motions to dismiss.

---

[1] At the time that Wilbur-Ellis filed its motion to dismiss, Wilbur-Ellis' motion sought dismissal of Diversified's first amended crossclaims and third-party claims. Afterwards, Diversified amended its complaint and filed its Second Amended Crossclaims and Third Party Complaint without leave of the court.  *See* [#525].  In Diversified's opposition to Wilbur-Ellis' motion to dismiss, it argues that it was justified in amending its complaint because its amendment was in response to Blue Buffalo's amended pleading.  It also asks that, if I find leave of the court was required, that I grant it leave under FRCP 15.  Wilbur-Ellis argues that Diversified's second amended complaint is not properly before the court and that I should only consider its allegations in its first amended complaint.  However, Wilbur-Ellis does address the new allegations in Diversified's second amended complaint in its reply brief.  While Diversified should have sought leave of the Court to file its Second Amended Crossclaims and Third Party Complaint, because leave to amend is to be freely granted under FRCP 15, I find that it is properly before the Court now and will consider it to be the controlling pleading.  Additionally, because Wilbur-Ellis addressed the amendments in its reply brief, no further briefing is necessary and will rule on Wilbur-Ellis' motion as though it were brought against Diversified's Second Amended Crossclaims and Third Party Complaint.

## Legal Standard

In ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), I must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While a court must accept factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Carton v. Gen. Motor Acceptance Corp.*, 611 F.3d 451, 454 (8th Cir. 2010) (internal citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (internal citations omitted). Unlike state courts which often require detailed statements of fact in a petition, however, the federal rules require only notice pleading. Under Fed. R. Civ. P. 8(a):

> [A] complaint must include only a short and plain statement of the claim showing that the pleader is entitled to relief. Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.

*Romine v. Acxiom Corp.*, 296 F.3d 701, 711 (8th Cir. 2002).

## Discussion

### 1. RICO (Count 1)

In Count 1, Diversified brings a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1962(d), 1964(c), against the Wilbur-Ellis

and Custom Ag Defendants ("RICO Defendants").  Diversified alleges that the RICO

Defendants conspired to and violated RICO by forming an illegal association-in-fact enterprise

to manufacture, market, mislabel, and sell adulterated ingredients over the course of more than

four years.  In the alternative to the association-in-fact enterprise, Diversified alleges that the

RICO Defendants colluded with the common purpose of taking over Custom Ag as an enterprise.

Diversified alleges that the RICO Defendants sold the mislabeled and adulterated meal at

inflated prices as though it were unadulterated meal, and that they accomplished this by

falsifying bills of lading, invoices, and ingredient certifications.  Diversified alleges that these

acts constitute the chargeable predicate RICO offenses of wire and mail fraud.  Additionally,

Diversified alleges that the RICO Defendants devised this enterprise to defraud the entire pet

food and livestock food industries, including Diversified as the ingredient broker between the

RICO Defendants and Blue Buffalo, who ultimately purchased Wilbur-Ellis' products.

Diversified's Second Amd. Crossclaims and Third Amd. Compl. [#525] at ¶¶ 45-59.

RICO prohibits "any person employed by or associated with any enterprise engaged in . .

. interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To establish

a civil claim under RICO, plaintiffs must show that the defendants engaged in "(1) conduct (2) of

an enterprise (3) through a pattern (4) of racketeering activity."  *H & Q Properties, Inc. v. Doll*,

793 F.3d 852, 855-56 (8th Cir. 2015) (internal citations omitted).  As the United States Court of

Appeals for the Eighth Circuit has repeatedly cautioned, "RICO, however, 'does not cover all

instances of wrongdoing.  Rather, it is a unique cause of action that is concerned with eradicating

organized, long-term, habitual criminal activity.'"  *Id.* (internal citations and quotations omitted).

"Failure to present sufficient evidence on any one element of a RICO claim means the entire

claim fails." *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1028 (8th Cir. 2008).

Federal Rule of Civil Procedure 9(b) applies to RICO claims. *H & Q Properties, Inc. v. Doll*, 793 F.3d 852, 855 (8th Cir. 2015) (internal citations and quotations omitted). Under FRCP 9(b), "[i]n alleging fraud ... a party must state with particularity the circumstances constituting fraud." The "[c]ircumstances" of the fraud include "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" *Id.* at 855-56 (internal citations and quotations omitted). "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (internal quotations omitted). Additionally, "[a]llegations pleaded on information and belief usually do not meet Rule 9(b)'s particularity requirement." *Id.* (internal citations omitted). But "[w]hen the facts constituting the fraud are peculiarly within the opposing party's knowledge, [] such allegations may be pleaded on information and belief." *Id.* at 783-84.

Both the Wilbur-Ellis Defendants and the Custom Ag Defendants have moved to dismiss the RICO claims against them for failure to state a claim under FRCP 12(b)(6) and 9(b). The Wilbur-Ellis Defendants argue that Diversified has failed to sufficiently allege or plead the existence of a RICO enterprise, participation in the conduct of an enterprise's affairs, the existence of a pattern of racketeering activity, or that the individual defendants engaged in a pattern of racketeering activity by committing two or more predicate acts. The Custom Ag Defendants argue that Diversified has failed to state its claims with particularity, and that it has failed to sufficiently plead the existence of a RICO enterprise, predicate acts, or a pattern of racketeering activity.

*a) Participation in the Conduct of an Enterprise*

"The definition of a RICO 'enterprise' includes 'any union or group of individuals associated in fact although not a legal entity.'" 18 U.S.C. § 1961(4); *United States v. Henley*, 766 F.3d 893, 906 (8th Cir. 2014) cert. denied sub nom. *Peteet v. United States*, 135 S. Ct. 1516, 191 L. Ed. 2d 449 (2015) and cert. denied, 135 S. Ct. 2065, 191 L. Ed. 2d 968 (2015). "[A]n association-in-fact enterprise must have at least three structural features: a purpose,[2] relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."[3] *Boyle v. United States*, 556 U.S. 938, -----, 129 S.Ct. 2237, 2244, 173 L.Ed.2d 1265 (2009); *see also United States v. Henley*, 766 F.3d 893, 906 (8th Cir. 2014) ("[T]o prove the existence of a RICO enterprise the government must offer proof of (1) a common or shared purpose that animates the individuals associated with it, (2) a formal or informal organization of the participants in which they function as a unit, including some continuity of both structure and personnel, and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity."). The RICO "enterprise" must be distinct from the "person" who operates or manages the enterprise. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 160, 121 S. Ct. 2087, 2089, 150 L. Ed. 2d 198 (2001). And that "person" must have "conducted or participated in the conduct of the 'enterprise's affairs,' not just

---

[2] "Evidence of a common purpose may 'be circumstantial, as by evidence that the group of individuals functions as a continuing unit in an informal or formal organization engaged in a course of conduct directed toward the accomplishment of the common purpose alleged.'" *United States v. Henley*, 766 F.3d at 906 (internal citation omitted).

[3] "Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis." *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir. 1987) (internal citations omitted). However, "[w]hile the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Boyle v. United States*, 556 U.S. 938, 948, 129 S. Ct. 2237, 2245, 173 L. Ed. 2d 1265 (2009).

[its] own affairs."[4] *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (emphasis in original).

### 1) The Wilbur-Ellis and Custom Ag Enterprise

The Wilbur-Ellis Defendants argue that Diversified has not sufficiently alleged the existence of a RICO enterprise or their participation in the conduct of a RICO enterprise. The Wilbur-Ellis Defendants point to the United States Court of Appeals for the Seventh Circuit's opinion in *Walgreen* for support, arguing that here, like in *Walgreen*, the plaintiff has merely alleged that defendants had a commercial relationship through which they pursued their own self-interests, "as opposed to acting on behalf of a distinct enterprise" as required by RICO. *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854-56 (7th Cir. 2013).

In *Walgreen*, the plaintiff alleged that "the members of the enterprise associated for the common purpose of profiting from illegally substituting Par's more expensive dosage forms of ranitidine and fluoxetine for the cheaper dosage forms actually prescribed." *Walgreen*, 719 F.3d at 854. The Seventh Circuit found that these allegations were insufficient to state a RICO claim, reasoning that the complaint merely alleged activities consistent with the existence of a business partnership, even if they were fraudulent or illegal. *Id.* at 854-55. The court distinguished such allegations from those that would be more suggestive of a RICO enterprise, such as allegations that "officials from either company involved themselves in the affairs of the other," that "profits from the illegal [] scheme were siphoned off to the [] enterprise or to individual enterprise members," or allegations that "accused individual corporate personnel of improperly hijacking

---

[4] Under RICO, "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S. Ct. 1163, 1173, 122 L. Ed. 2d 525 (1993). "RICO liability is not limited to those with primary responsibility for the enterprise's affairs," nor is it "limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." *Id.* at 179.

the business operations of their companies for illicit ends." *Id.* "Instead," the court held, "the activities the complaint describes are entirely consistent with Walgreens and Par each going about its own business, with Par manufacturing generic drugs and marketing its products to pharmacies, and Walgreens purchasing drugs and filling prescriptions." *Id.*

Diversified argues that it has expressly alleged a coordinated effort by the RICO Defendants because it alleged that Haning, Rychlik, Harwell, and Wilbur-Ellis purchased, blended, and mislabeled feather meal; that Haning and Geraci coordinated the effort between Wilbur-Ellis and Custom Ag to present the adulterated and mislabeled meal as genuine meal and to inflate the prices; and that the RICO Defendants coordinated their efforts to falsify the product certifications, bills of lading, and invoices to Diversified and Blue Buffalo. Diversified also argues that neither entity could have accomplished its scheme without the other, so therefore the defendants were acting on behalf of the enterprise.

Diversified's allegations here are on par with those in *Walgreen*. And like the *Walgreen* Court, I also conclude that Diversified has failed to sufficiently allege participation as well as a common purpose distinct from that inherent in the conduct of a pattern of racketeering activity. Even when taking its allegations to be true, Diversified merely alleges the existence of a commercial partnership that would benefit each defendant's own self-interests. In the Wilbur-Ellis Defendants' case, that would be the purpose of supplying poultry and poultry byproduct meal to ingredient brokers like Custom Ag, and in the Custom Ag Defendants' case, that purpose would be acting as an ingredient broker and purchasing for re-sale pet food ingredients. Like *Walgreen*, the Complaint here does not allege that officials from either company inserted themselves in the affairs of the other. There is no allegation, for example, that Custom Ag or Geraci were involved in Wilbur-Ellis' manufacturing process, or that Wilbur-Ellis and its

employees were involved in creating Custom Ag's bills of lading of certifications. In fact, the complaint never alleges that Custom Ag or Geraci certified compliance with Blue Buffalo's ingredient specifications. Instead, the complaint states that when Custom Ag was asked if the product would meet Blue Buffalo's specifications, Custom Ag directed the question to Wilbur-Ellis, who then answered directly to Diversified.

Diversified has also failed to sufficiently allege continuity of structure or "relationships among those associated with the enterprise [] and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938. First, Diversified's allegations about continuity of structure are merely conclusory statements. Diversified alleges, in conclusory fashion, that the RICO Defendants carried out the alleged scheme through their roles in the respective companies, and that the RICO Defendants earned and shared illegal profits from this alleged scheme. Diversified also alleges in conclusory fashion that the RICO Defendants "coordinated inflated prices" because Custom Ag knowingly resold byproduct, which it had purchased at below-market price, as though it were genuine poultry meal and for a marked-up price.[5] These types of conclusory allegations do not suffice under Rules 12(b)(6) and 9(b). *Iqbal*, 556 U.S. at 678; *Carton*, 611 F.3d at 454.

Second, Diversified's argument that the Wilbur-Ellis and Custom Ag Defendants could not have accomplished the scheme without each other, so therefore they were acting on behalf of the enterprise, also fails to establish continuity of structure or participation in an enterprise.

---

[5] These already tenuous allegations rest upon another even more tenuous allegation: that when Diversified inquired about purchasing chicken meal from Wilbur-Ellis, Haning told Diversified it had to go through Custom Ag because Wilbur-Ellis had already sold all of its available inventory, but Custom Ag might still have some of Wilbur-Ellis' contracted-for chicken meal available. Diversified alleges on information and belief that there was no contract in place at that time, and Wilbur-Ellis steered Diversified's business towards Custom Ag to add a layer of insulation between itself and Diversified. Following Diversified's theory, this alleged fraud is at the root of the scheme because it allowed Wilbur-Ellis to manipulate the product labels and certifications Diversified ultimately received because Custom Ag placed its own labels on the shipments.

Much like the *Walgreen* court found, it is "far from obvious" that Wilbur-Ellis could not have accomplished the alleged scheme by itself, by simply mislabeling its shipments on its own. *Walgreen*, 719 F.3d at 856. Additionally, any cooperation that was required for the RICO Defendants to execute the scheme as alleged would have been the type of cooperation that is already required by their ordinary business relationship as ingredient suppliers and brokers. It was not the type of cooperation that falls outside the bounds of the parties' normal relationships. *See id.*

Moreover, noticeably absent from the complaint is any allegation that the individual RICO defendants knew of each other's existence. The only specific relationship alleged is between Haning and Geraci, and there all Diversified alleges is that they were longtime friends and hunting companions. Even under the more relaxed standards of *Boyle*, this is insufficient.

As the *Walgreen* Court held, while Diversified's allegations "do not entirely rule out the inference that [the RICO Defendants] were acting in concert on behalf of a shadow enterprise while maintaining the outward appearance of a normal commercial relationship, there is ultimately not enough in this complaint to elevate that inference from a "sheer possibility" to something that is "plausible on its face." *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.,* 719 F.3d 849, 855 (7th Cir. 2013) (citing *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937). This is especially true where FRCP 9(b) requires that the circumstances constituting fraud be plead with particularity and the bulk of Diversified's more specific allegations are pleaded "on information and belief." *See H & Q Properties, Inc. v. Doll*, 793 F.3d 852, 855-56 (8th Cir. 2015); *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (internal quotations omitted).

### 2) The "Custom Ag Enterprise"

In addition to alleging an association-in-fact enterprise consisting of the Wilbur-Ellis and Custom Ag Defendants, Diversified pleads, in the alternative, that the RICO Defendants "colluded with the common purpose of taking over Custom Ag as an Enterprise through which the Defendants illegitimately controlled and operated a racketeering scheme for the common purpose of manufacturing, marketing, mislabeling, and selling adulterated ingredients over the course of more than four years in violation of state and federal law." [#525] at ¶ 47. Diversified also alleges that, "Custom Ag, the Enterprise, also may have functioned as a legitimate corporation that sold properly labeled and unadulterated commodities and existed independent of the Defendants' illegal racketeering scheme." *Id.*

The Custom Ag Defendants argue that Diversified's alternative theory of the RICO Defendants taking over Custom Ag as the enterprise is impermissible as a matter of law because a RICO enterprise must be distinct from a named defendant. *See Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 89 (2d Cir. 1999). However, Diversified alleges that the Wilbur-Ellis and Custom Ag Defendants comprise the "Custom Ag Enterprise," which Diversified alleges is a separate entity from Custom Ag, the legitimate business. With the inclusion of the Wilbur-Ellis Defendants, Diversified has pleaded that the "Custom Ag Enterprise" is distinct from any of the "persons," i.e., Custom Ag and any associated employees, named in the complaint.

Diversified's alternative enterprise theory ultimately fails, however, for the same reasons set out above in relation to the alleged association-in-fact enterprise. As above, here, too, Diversified's complaint does not sufficiently allege participation or that there was a common purpose distinct from that inherent in the conduct of a pattern of racketeering activity. Nor does

it sufficiently allege continuity of structure or "relationships among those associated with the enterprise [] and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 938; *Iqbal*, 556 U.S. at 678. "RICO [] 'does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'" *H & Q Properties, Inc. v. Doll*, 793 F.3d 852, 855-56 (8th Cir. 2015) (internal citations and quotations omitted).

### 3) RICO Conspiracy

Diversified's failure to adequately allege that the RICO Defendants participated in the conduct of an enterprise is also fatal to its RICO conspiracy claim under § 1962(d). To allege a RICO conspiracy, a plaintiff must first establish a right to relief under § 1962(c), and then allege "either that a defendant personally agreed to commit two predicate acts in furtherance of the enterprise or that a defendant 'agree[d] to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise.'" *United States v. Henley*, 766 F.3d 893, 908 (8th Cir. 2014). Because Diversified has failed to allege the existence of an enterprise, it has also failed to allege that they agreed to participate *in the conduct of an enterprise* or that they actually committed the requisite predicate acts *in furtherance of the enterprise*.

For all of these reasons, I conclude that Diversified has failed to state a claim for a RICO violation or a RICO conspiracy, and these claims will be dismissed against all parties. *See* Fed. R. Civ. P. 12(b)(6).[6]

_____

[6] The RICO Defendants also argue that Diversified has failed to sufficiently allege the existence of a pattern of racketeering activity for each defendant. Because the "[f]ailure to present sufficient evidence on any one element of a RICO claim means the entire claim fails," *Craig Outdoor Advert., Inc. v. Viacom Outdoor*, Inc., 528 F.3d 1001, 1028 (8th Cir. 2008), I need not and therefore will not address these additional arguments for dismissal.

2. Texas Deceptive Trade Practices Act (Count 2)

In Count 2, Diversified alleges that Wilbur-Ellis and Custom Ag violated the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41 *et seq*. Both Wilbur-Ellis and Custom Ag move to dismiss this claim, arguing that it is barred by the DTPA.

Only a "consumer" may bring a claim under the DTPA. Tex. Bus. & Com. Code § 17.50. Although "consumer" is defined in the DTPA to include a corporation under narrow circumstances, *see id.* § 17.45(4), the DTPA specifies that "[n]othing in this subchapter shall apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence." *Id.* § 17.49(g). The purpose of this limitation is to "maintain the DTPA as a viable source of relief for consumers in small transactions and to remove litigation between businesses over large transactions from the scope of the DTPA." *E. Hill Marine, Inc. v. Rinker Boat Co.*, 229 S.W.3d 813, 820 (Tex. App. 2007). Several courts have held that an ongoing series of transactions of the same kind involving consideration of more than $500,000 fall outside the scope of the Act. *See, e.g., Obermeyer Hydro Accessories, Inc. v. CSI Calendering, Inc.*, No. 14-CV-00184-RM-KMT, 2015 WL 506896, at *2-4 (D. Colo. Feb. 5, 2015).

Wilbur-Ellis and Custom Ag argue that Diversified's DTPA claim falls outside the scope of the Act because Diversified itself alleges that it participated in an ongoing series of transactions of the same kind (to purchase chicken and turkey meal) for which it paid over $63 million, well in excess of the DTPA's $500,000 limit. *See* [#525] at ¶¶ 54, 69, 105. Diversified contends that dismissal at this time would be premature because the question of whether there was a series of ongoing related transactions constituting a project worth over $500,000 is an

evidentiary question. Diversified also half-heartedly argues that dismissal is improper because the Wilbur-Ellis Defendants have plead that there was not a contract in this case, and the Custom Ag Defendants have not admitted that a contract with Diversified existed.

In ruling on a motion to dismiss brought under FRCP 12(b)(6), I must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir. 1993). Thus, the fact that Wilbur-Ellis and Custom Ag have not pleaded the existence of a contract is of no import. To the contrary, because Diversified's complaint pleads that such contracts existed, I must accept that fact as true. *See* [#525] at ¶ 105 ("Diversified entered into a series of supply contracts with Custom Ag and Wilbur-Ellis from 2011 to 2014 for chicken and turkey meal").

Additionally, despite Diversified's argument otherwise, I do not need to make a factual determination about whether the parties engaged in an ongoing project worth over $500,000 because Diversified's pleading, even when taken in the light most favorable to it, alleges that they did. Diversified pleads that there was a "pattern of false bills of lading, certifications and invoices and paid the inflated prices from Custom Ag (for chicken meal and for a period of time, turkey meal) and Wilbur-Ellis (for turkey meal) totaling more than $63 million over more than four years." [#525] at ¶ 54. Diversified also explicitly alleges that Wilbur-Ellis and Custom Ag had a "sustained course of action in selling the Adulterated Meal as high-quality and single-ingredient chicken or turkey meal for four years." *Id.* at ¶ 69. These statements amount to an allegation that Wilbur-Ellis and Custom Ag engaged in "a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence." Tex. Bus. & Com. Code § 17.49(g); *see also Obermeyer Hydro Accessories, Inc. v. CSI Calendering, Inc.*,

No. 14-CV-00184-RM-KMT, 2015 WL 506896, at *2-4 (D. Colo. Feb. 5, 2015) (granting

motion to dismiss DTPA claims because pleading alleged series of related transactions involving

consideration of over $500,000). As a result, I will dismiss Diversified's claim under the Texas

Deceptive Trade Practices Act (Count 2) from the complaint.

    3.  <u>Washington Consumer Protection Act (Count 3)</u>

In Count 3, Diversified alleges that Wilbur-Ellis violated the Washington Consumer

Protection Act ("WCPA"), Wash. Rev. Code §§ 19.86.010, *et seq*., because of the alleged

ingredient misrepresentations discussed above.

To prevail in a WCPA claim, a plaintiff must establish: (1) an unfair or deceptive act or

practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in

his or her business or property; and (5) causation. *Hangman Ridge Training Stables, Inc. v.

Safeco Title Ins. Co.*, 105 Wash. 2d 778, 780 (1986); Wash. Rev. Code § 19.86.020.

Wilbur-Ellis argues that this claim should be dismissed because Diversified has failed to

sufficiently allege an unfair or deceptive act or practice and public interest impact.

Proof of an unfair or deceptive act or practice occurring in trade or commerce:

> may be established by a showing that (1) an act or practice which has a capacity
> to deceive a substantial portion of the public (2) has occurred in the conduct of
> any trade or commerce. Alternatively, these two elements may be established by a
> showing that the alleged act constitutes a per se unfair trade practice. A per se
> unfair trade practice exists when a statute which has been declared by the
> Legislature to constitute an unfair or deceptive act in trade or commerce has been
> violated.

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 785-86, 719

P.2d 531, 535 (1986). Diversified pleaded that Wilbur-Ellis' alleged misrepresentations had the

capacity to deceive a substantial portion of the public through trade or commerce because the

mislabeled ingredients were used in Blue Buffalo products and distributed to consumers in

Washington. [#525] at ¶ 83-93. This is sufficient to show that the "act or practice [] has a capacity to deceive a substantial portion of the public" under federal notice pleading standards. *See id.*[7]

Wilbur-Ellis also argues that Diversified has failed to plead a public interest impact. A plaintiff may establish a public interest impact for private disputes, as opposed to consumer transactions, if it shows "the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 790, 719 P.2d 531, 538 (1986).

> Factors indicating public interest in this context include: (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions? As with the factors applied to essentially consumer transactions, not one of these factors is dispositive, nor is it necessary that all be present.

*Id.* at 790-91.

Diversified alleges that there is a public interest impact because the mislabeled product sold to Diversified was incorporated into Blue Buffalo's pet food products and delivered to consumers. Although Diversified has not pleaded that additional plaintiffs have been or will be injured in exactly the same fashion as it has been, nor has Diversified addressed the four factors indicating public interest in the private dispute context, I conclude that Diversified has pleaded enough to state a claim under federal notice pleading standards. As the *Hangman Ridge* court stated in setting out this factor-based inquiry, "whether the public has an interest in any given action is to be determined by the trier of fact from several factors, depending upon the context in

---

[7] Diversified also argues (though it has not pleaded) that Wilbur-Ellis violated AAFCO and Washington state statute, which it argues would establish a *per se* unfair trade practice. *See id.* at 11-14, 76-77; *see also* Wash. Rev. Code § 15.53.901(2); Wash. Rev. Code § 15.53.902. Because I have already concluded that Diversified has pleaded that the act has a capacity to deceive a substantial portion of the public, I need not determine whether Diversified's argument that there was a *per se* unfair trade practice is meritous.

which the alleged acts were committed." *Id.* at 789-90. Moreover, "not one of these factors is dispositive, nor is it necessary that all be present." *Id.* at 791. The federal rules only require notice pleading. Diversified's pleading gives Wilbur-Ellis fair notice of what its claim is and the grounds upon which it rests. *See Romine v. Acxiom Corp.*, 296 F.3d 701, 711 (8th Cir. 2002). That is sufficient to overcome Wilbur-Ellis' motion to dismiss.

Finally, and in the alternative to dismissing the WCPA claim for failure to plead the elements, Wilbur-Ellis asks me to stay Diversified's claim pending the Washington Supreme Court's decision on the extraterritorial applicability of the Washington statute, which question was certified to that court in *Thornell v. Seattle Serv. Bureau, Inc.*, No. C14-1601 MJP, 2015 WL 999915, at *3 (W.D. Wash. Mar. 6, 2015). Wilbur-Ellis contends that the WCPA does not apply to Diversified's claims because it is meant to protect Washington consumers from in-state activities and defendants. After this motion was briefed, the Washington Supreme Court answered the certified question regarding the exterritorial applicability of the WCPA, holding that "the CPA supports a cause of action for an out-of-state plaintiff to sue an out-of-state defendant for the allegedly deceptive acts of its in-state agent." *Thornell v. Seattle Serv. Bureau, Inc.*, 184 Wash. 2d 793, 796, 363 P.3d 587, 589 (2015). In reaching its holding, the *Thornell* court emphasized that a broad reading of the WCPA is proper. *Id.* at 800-802.

Diversified is a citizen of the state of Missouri and Wilbur-Ellis is a California company with most of its challenged conduct occurring in Texas. However, Diversified alleges that the Feed Division of Wilbur-Ellis is located in Vancouver, Washington, and that the Division Quality Manager of the Feed Division of Wilbur-Ellis, Eric Johansen, made misrepresentations as to the ingredients from his Washington office. [#525] at ¶ 76. Diversified also alleges that these misrepresentations "were in the form of Ingredient Information Request Forms from Blue

Buffalo and the Wilbur-Ellis responses to questionnaires which were relied upon by Diversified and Blue Buffalo." *Id.* at ¶ 77. These allegations are sufficient to support the inference that Wilbur-Ellis has an agent in Washington, which may provide a basis for extraterritorial application of the WCPA under *Thornell*. As a result, I will not dismiss the WCPA claim on this ground, either.

### 4. Fraudulent Misrepresentation (Count 4)

In Count 4, Diversified alleges that the Wilbur-Ellis and Custom Ag Defendants made material misrepresentations to Diversified and others about the type, quality, and characteristics of the chicken and turkey meal it purchased from 2011 to 2014. Diversified alleges that it relied on these misrepresentations when it purchased the chicken and turkey meal from the defendants, and that its damages total over $63 million.

The Wilbur-Ellis Defendants argue that this claim should be dismissed because it is barred by the economic loss doctrine under Missouri law. In the alternative, the Wilbur-Ellis Defendants argue that the claim should be dismissed under Rule 9(b) because Diversified has not sufficiently alleged two of the elements of a fraudulent misrepresentation claim: that the individual defendants knew the representations were false, or that they intended for Diversified to rely upon the representations.

"The economic loss doctrine prohibits a commercial buyer of goods 'from seeking to recover in tort for economic losses that are contractual in nature.'" *Dannix Painting, LLC v. Sherwin-Williams Co.*, 732 F.3d 902, 905-06 (8th Cir. 2013) (citing *Autry Morlan*, 332 S.W.3d at 192). "'[D]istinguished from harm to person or damage to property,' economic, or commercial, 'loss includes cost of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or

use.'" *Id.* at 905 (internal quotations omitted) (quoting *Groppel Co. v. U.S. Gypsum Co.*, 616 S.W.2d 49, 55 n. 5 (Mo.Ct.App.1981)).  Economic loss also includes "'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" *Id.* (internal quotations omitted).

Under the economic loss doctrine, Missouri courts will bar tort claims that seek to recover for economic losses unless the claims are based on misrepresentations that are independent of the contract.  *AKA Distrib. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998).  Two key factors in examining whether a fraud claim is independent of a contract claim under the economic loss doctrine are: (1) whether the subject matter of the alleged misrepresentations was incorporated into the parties' contract; and (2) whether the plaintiff suffered additional damages outside the contract as a result of the alleged fraud.  *Compass Bank v. Eager Road Associates*, LLC, 922 F.Supp.2d 818, 827 (E.D.Mo.2013) (internal citations omitted); *see also Trademark Med., LLC v. Birchwood Labs., Inc.*, 22 F. Supp. 3d 998, 1003 (E.D. Mo. 2014).  The economic loss doctrine applies to bar claims of negligence as well as fraud.  *See Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 878 (8th Cir. 2000).

The Missouri Supreme Court has yet to decide whether the economic loss doctrine bars fraudulent misrepresentation claims related to defective products.  Therefore, I must "predict how [that court] would resolve the issue if confronted with it." *Jackson v. Anchor Packaging Co.,* 994 F.2d 1295, 1301 (8th Cir. 1993).

Diversified's fraudulent misrepresentation claim alleges that the Wilbur-Ellis and Custom Ag Defendants made material false representations to Diversified and others about the type, quality, and characteristics of the chicken and turkey meal it purchased from 2011 to 2014.  These are the same misrepresentations that Diversified alleges as the basis of its contract-based

claims. *See* [#525] at ¶¶ 116-138 (alleging that Diversified entered into contracts with the defendants for the sale of chicken and turkey meal, for the purpose of re-selling the meal to Blue Buffalo, that Diversified contracted to purchase high-quality chicken and turkey meal that contained no byproduct, that the defendants agreed to meet Diversified's ingredient specifications, but they did not, and instead produced adulterated chicken and turkey meal byproduct).

Diversified argues that a decision on whether the economic loss doctrine applies is premature at this stage, when the contract is not before the Court. Diversified also argues that it has only alleged that it had a contract with Wilbur-Ellis for turkey meal and, for a short time, chicken meal. Accordingly, Diversified contends that its allegations of fraudulent misrepresentation that go to the sales of chicken meal outside of the contract are not barred by the economic loss doctrine. Finally, Diversified argues that even if the economic loss doctrine applies here, its claims fall within the public duty exception to the doctrine and should not be barred.

The Eighth Circuit has held that where a representation concerns the quality or safety of the goods sold, the economic loss doctrine bars the fraud claims because they are "substantially redundant" with warranty claims. *Marvin Lumber and Cedar Co. v. PPG Industries, Inc.,* 223 F.3d 873, 885 (8th Cir.2000). Here, even though the contract is not before me, Diversified has alleged that it has a contract with Wilbur-Ellis and that the contract was breached because of misrepresentations about the quality of the product sold. Reliance on what Diversified has *alleged* is proper at the motion to dismiss stage. *See* Fed. R. Civ. P. 12(b)(6). Accordingly, application of the doctrine is not premature, and I conclude that the economic loss doctrine

applies to bar Diversified's fraudulent misrepresentation claim because they are substantially redundant of its contract claims.

Furthermore, the economic loss doctrine extends to bar claims relating to all of the chicken meal at issue. Although Diversified's contracts for chicken meal were only in place with Wilbur-Ellis for some of the time it is alleged to have been misled, Diversified asserts the fraudulent misrepresentation and breach of contract claims against both the Wilbur-Ellis and Custom Ag Defendants, and seeks to recover jointly and severally for any contract breaches, making its fraudulent misrepresentation claims about the chicken meal substantially redundant of its contract claims.

Additionally, I conclude that the public duty exception does not apply here. Diversified argues that Missouri courts created a public duty exception for negligent misrepresentation in *B.L. Jet Sales*. In that case, the plaintiff bought a used airplane plagued by fuel tank corrosion. 724 S.W.2d at 670. The plaintiff sued the seller and the company that serviced the plane for failing to log or disclose previous fuel tank repairs. *Id.* There was no privity of contract or direct dealings between the plaintiff and the service company. *Id.* The Missouri Court of Appeals held that plaintiff had stated a claim for negligent misrepresentation against the service company despite the fact that plaintiff alleged only economic loss. *Id.* at 672. In reaching its conclusion, the court noted that the service company had a public duty created by federal aviation regulations to disclose the repairs. *Id.* at 672–73. The court also relied on the Restatement (Second) of Torts § 552 and negligent representation cases "from Missouri and other jurisdictions," although it failed to mention or discuss those cases. *Id.* at 673. The plaintiff relied on *B.L. Jet Sales* in Judge Limbaugh's *Bruce Martin Construction* case and made the same arguments in opposition to dismissal that plaintiff makes here. Judge Limbaugh rejected these arguments and refused to

adopt the state court's reasoning because of the "state court's ambiguous legal analysis, [and] . . . the disparity of the factual issues presented." *Id.* at *4. Like Judge Limbaugh, I also decline to apply *B.L. Jet Sales* because the facts of this case differ substantially from those in *B.L. Jet Sales* and the state court failed to support its decision with any case law. *Id.*; *see also Dannix Painting, LLC*, 2012 WL 6013217, at *2-3.

Finally, I note that the Custom Ag Defendants filed a separate motion to dismiss in which they also seek dismissal of Diversified's fraud claims. The Custom Ag Defendants do not argue, however, that the claims should be dismissed because of the economic loss doctrine. As stated above, the economic loss doctrine "prohibits a commercial buyer of goods 'from seeking to recover in tort for economic losses that are contractual in nature.'" *Dannix Painting*, 732 F.3d at 905-06. Although the Custom Ag Defendants did not assert this argument, because Diversified also alleges that a contract existed with Custom Ag concerning the same subject matter as its fraud claims, I must conclude that its fraudulent misrepresentation claim against Custom Ag is also barred, as a matter of law, by the economic loss doctrine, and I will dismiss the claim in its entirety.[8]

5. Fraudulent Concealment (Count 5)

In Count 5, Diversified alleges a claim for "fraudulent concealment" against the Wilbur-Ellis and Custom Ag Defendants. As an initial matter, Missouri courts have not recognized a separate claim of fraudulent concealment. Rather, in cases where misrepresentation is alleged to have occurred by nondisclosure, "a party's silence in the face of a legal duty to speak replaces the first element [of a fraudulent misrepresentation claim]: the existence of a representation.

---

[8] Having concluded that the claim is barred under the economic loss doctrine, I need not and therefore will not address the defendants' arguments that the claim should be dismissed for failure to state a claim under Rules 12(b)(6) and 9(b).

*Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007) (citing *Andes v. Albano*, 853 S.W.2d 936, 943 (Mo. banc 1993)).

Wilbur-Ellis argues that, whatever its label, this claim is also barred by the economic loss doctrine for the same reasons set out above regarding Diversified's claim for fraudulent misrepresentation.

In Count 5, Diversified alleges that "Defendants concealed material facts about the ingredients, type, and character of the Adulterated Meal, specifically that it contained significant amounts of byproducts and feather meal. Defendants knew Diversified was ignorant of and did not have an equal opportunity to discover the true facts." [#525] at ¶ 104. Like the allegations in the fraudulent misrepresentation claim, these allegations also allege misconduct substantially redundant of Diversified's contract claims through which Diversified seeks to recover in tort for economic losses that are contractual in nature. As a result, the claim is barred by the economic loss doctrine and will be dismissed against all defendants.[9]

6. Fraud in the Inducement (Count 6)

In Count 6, Diversified alleges a claim for fraud in the inducement against the Wilbur-Ellis and Custom Ag Defendants. Wilbur-Ellis again argues that this claim is barred by the economic loss doctrine because the subject matter of the claims is substantially redundant of its breach of contract claims. In general, fraud in the inducement, necessarily prior to the contract, is independent of the contract and therefore not barred by the economic loss doctrine. *See Marvin Lumber and Cedar Co. v. PPG Industries, Inc.,* 223 F.3d 873, 885 (8th Cir.2000). However, when alleged misrepresentations concern the same subject matter that is incorporated into the parties' contract, even though they were made prior to contract formation, the claim is

---

[9] Having concluded that the claim is barred under the economic loss doctrine, I need not and therefore will not address the defendants' other arguments for dismissal.

not independent of the contract and therefore is barred by the economic loss doctrine. *See*

*Compass Bank v. Eager Rd. Associates, LLC*, 922 F. Supp. 2d 818, 827 (E.D. Mo. 2013).

Here, Diversified has alleged that the defendants made material misrepresentations before it entered into the contracts to induce Diversified to enter into the contracts, including "statements that Wilbur-Ellis chicken meal and turkey meal met and would continue to meet the specifications of Diversified's customers, including the product specifications of Blue Buffalo." *See* [#525] at ¶¶ 111-112. These allegations concern the same subject matter encompassed by the contract (as alleged by Diversified). Additionally, Diversified does not seek relief for damages outside of the contract. As a result, Diversified's claim for fraud in the inducement is barred by the economic loss doctrine and will be dismissed against all defendants.[10]

### 7. Breach of Contract (Count 7)

In Count 7, Diversified brings a breach of contract claim against Wilbur-Ellis and Custom Ag. Custom Ag moves to dismiss this claim against it, arguing that Diversified has not alleged that it was party to a contract or at least to the terms of the contract agreeing to meet Blue Buffalo's specifications. A review of the complaint, however, shows that Diversified has alleged that a contract existed with both Wilbur-Ellis and Custom Ag, and that both companies agreed to provide Diversified with high-quality chicken and turkey meal that contained no byproduct or feathers. *See* [#525] at ¶¶ 117-19; 28-29.

Custom Ag also argues that the breach of contract claim is subsumed by Diversified's warranty claims. The Missouri Supreme Court has held:

> Under Missouri law, remedies for economic loss sustained by reason of damage
> to or defects in products sold are limited to those under the warranty provisions of
> the UCC. The UCC recognizes that breach of contract and breach of warranty are

---

[10] Again, having concluded that the claim is barred under the economic loss doctrine, I need not and therefore will not address the defendants' other arguments for dismissal.

not the same cause of action. The remedies for breach of contract are set forth in section 2–711 and are available to a buyer "[w]here the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance." § 400.2–711.1. The remedies for breach of warranty are set forth in section 2–714 and are available to a buyer who has finally accepted goods, but discovers that the goods are defective in some manner. § 400.2–714; *see also* 1 White & Summers, *UCC* 702–3 ("We believe that only buyers who have accepted and neither rightfully rejected nor effectively revoked can use 2–714."). Here, the plaintiffs do not assert that Great Plains failed to make delivery or repudiated or that Crush rightfully rejected or justifiably revoked acceptance. There is no dispute that Crush accepted delivery of the T1055 and notified Great Plains about the machine's inability to perform terrain leveling adequately. Accordingly, Renaissance and TEAM cannot recover under section 400.2–711 for breach of contract. Their contract claims are subsumed by their breach of warranty claims for damages under section 400.2–714, which already have been addressed above. Plaintiffs' breach of contract claims fail as a matter of law.

*Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 130-31 (Mo. 2010) (internal citations omitted).

Here, Diversified expressly alleges that it "accepted Corporate Defendants' goods" and that those goods did not conform to the contracts. [#525] at ¶ 121. Diversified does not allege that defendants failed to make delivery or that it rejected acceptance. As a result, its breach of contract claim is subsumed by its warranty claims as a matter of law. *Renaissance Leasing, LLC*, 322 S.W.3d at 130-31. Moreover, because it is barred as a matter of law, it is not proper for Diversified to even plead it in the alternative, as it argues in opposition to dismissal. The only case Diversified cites for that principle in inapposite, which merely held that express and implied warranty claims may be pleaded in the alternative, but not that a breach of contract claim is available under similar facts. *See Trien v. Croasdale Const. Co., Inc.*, 874 S.W.2d 478, 480 (Mo. 1994). Furthermore, although Wilbur-Ellis has not moved to dismiss this claim against itself, because I find that the breach of contract claim is barred as a matter of law, I will also dismiss the breach of contract claim as against Wilbur-Ellis.

8.  Breach of Express Warranties (Count 8)

In Count 8, Diversified alleges that Wilbur-Ellis and Custom Ag breached their express warranties to provide Diversified with high-quality chicken and poultry meal that met Blue Buffalo's specifications.  UCC § 2-313.  Custom Ag moves to dismiss this claim, arguing that Diversified has not met the pleading requirements of *Iqbal* because it does not allege sufficient facts supporting the existence of a contract with Custom Ag or its agreement to meet specifications.

"An express warranty is created by any 'affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain . . . that the goods shall conform to the affirmation or promise.'"  RSMo. § 400.2–313.1(a).  *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 122 (Mo. 2010).  In Missouri:

> The elements for a breach of express warranty claim are: (1) the defendant sold goods to the plaintiff; (2) the seller made a statement of fact about the kind or quality of those goods; (3) the statement of fact was a material factor inducing the buyer to purchase the goods; (4) the goods did not conform to that statement of fact; (5) the nonconformity injured the buyer; and (6) the buyer notified the seller of the nonconformity in a timely fashion."

*Id.* (citing *Stefl v. Medtronic, Inc.,* 916 S.W.2d 879, 882–83 (Mo.App.1996)).

Diversified alleges that defendants "affirmed by descriptions and other statements of fact or promise that the goods Diversified purchased [] would conform to definitions and specifications of chicken meal and turkey meal of Diversified's customers."  [#525] at ¶ 126.  Additionally, throughout its complaint, Diversified more specifically alleges that Custom Ag affirmed descriptions of the goods as "chicken meal," "chicken meal blend," and "turkey meal," which Diversified also alleges were material terms that do not provide for the inclusion of by-product.  *See id.* at ¶¶ 98, 104, 111.  Finally, Diversified alleges that the meal did not meet the

promised description, it was unable to detect the nonconformity,[11] and as a result, it was injured. *Id.* at ¶¶ 127, 99, 104-06, 111-13, 121, 128.   These allegations are sufficient to state a claim for breach of express warranties under federal notice pleading standards.  Fed. R. Civ. P. 8(a).  As a result, I will deny Custom Ag's motion dismiss this claim.

   9.   Breach of Implied Warranty of Fitness for Particular Purpose (Count 9)

In Count 9, Diversified alleges that Wilbur-Ellis and Custom Ag breached the implied warranty of fitness for particular purpose by providing it with the allegedly adulterated meal containing byproduct and feathers.  [#525] at ¶¶ 129-134.  Under UCC § 2-315 and RSMo. § 400.2-315, an implied warranty that goods are fit for a particular purpose arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."

Custom Ag moves to dismiss this claim, arguing that Diversified merely pleads legal conclusions and that Diversified has failed to and cannot plead the requisite element of reliance. Custom Ag argues that because Diversified alleges that it referred all questions about the meaning of the blend term to Wilbur-Ellis, and that Diversified discussed that term with Wilbur-Ellis and Wilbur-Ellis alone, it cannot plausibly allege that it relied on Custom Ag's skill or judgment in selecting or furnishing suitable goods.  A review of Diversified's Complaint, however, shows that it has sufficiently alleged reliance and stated a claim for implied warranty of fitness for particular purpose against Custom Ag.

In its Complaint, Diversified alleges that it had a contract with Custom Ag for AAFCO-defined unadulterated chicken and turkey meal and that Custom Ag, through Troy Geraci, told Diversified that they were getting "low-ash chicken meal and regular chicken meal samples for

---

[11] Until 2014, at which point it notified defendants of the alleged breach.  [#525] at ¶ 121.

Blue Buffalo and falsely represented that the "samples will exact [sic] what they will b gettin [sic] on contract once they Agree. They [Wilbur-Ellis] will send a contract. 2 me [sic] my contract at that point will b forward 2 U !!" [#525] at ¶ 31. Diversified also alleges that on June 13, 2011, Geraci forwarded an email from Doug Haning with the test results for "Reg chicken meal blend" and "Low ash chicken meal blend." *Id.* at ¶ 32. Finally, Diversified alleges that Custom Ag paid lower market prices for the adulterated meal and marked it up as though it were unadulterated meal. [#525] at ¶¶ 28- 44. Under these facts, it is reasonable to infer that such acts, if true, were done to conceal the nature of the product being delivered and were undertaken because Diversified was relying upon Wilbur-Ellis and Custom Ag's representations that the product met its specifications. As a result, Diversified has sufficiently alleged reliance and stated a claim for breach of implied warranty of fitness for particular purpose against Custom Ag.

10. <u>Beach of Implied Warranty of Merchantability</u>

In Count 10, Diversified alleges that Wilbur-Ellis and Custom Ag breached the implied warranty of merchantability under UCC § 2-314. Under UCC § 2-314 and RSMo. 400.2-314(1), "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."

Custom Ag moves to dismiss Count 10 for failure to state a claim, arguing that Diversified merely pleads conclusory allegations. Custom Ag also argues that the claim fails because it turns on the "blend" contract language, which Custom Ag argues was not misleading, but rather, was properly used to represent that the product included a blend of ingredients from various suppliers. Although Diversified's pleadings under Count 10 are thin, Diversified incorporates by reference all of its earlier factual allegations, of which there are many, and which upon review provide sufficient basis for its claim under federal notice pleading standards.

*Romine*, 296 F.3d at 711.  Additionally, although Custom Ag's argument that the "blend" terminology was properly used may be a useful defense at trial, at this stage I must take Diversified's allegations to be true, and here, Diversified alleges that the blend terminology was used to mislead Diversified into thinking the goods were unadulterated when in fact they contained byproduct.

Custom Ag also argues that Diversified has failed to sufficiently plead that Custom Ag was a "merchant with respect to goods of that kind."  In paragraph 130 of its Complaint (which Diversified incorporates by reference into Count 10), Diversified alleges that "Corporate Defendants are merchants with the definition of Section 2-104 of the Uniform Commercial Code."  UCC § 2-104(1) defines "merchant" to "mean[] a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."  Although earlier in the Complaint Diversified merely alleges that Custom Ag "is primarily a wholesaler of fresh fruits and vegetables," [#525] at ¶ 2, its allegations throughout the complaint sufficiently plead that Custom Ag "deals in goods of the kind" "involved in the transaction."  *See id.* at ¶¶ 25, 29, 39 (alleging that Custom Ag contracted over several years to supply chicken and turkey meal to Diversified and others in the pet food industry).  As a result, Custom Ag's motion to dismiss Count 10 will be denied.

   11. Unjust Enrichment (Count 11)

In Count 11, Diversified alleges that Wilbur Ellis and Custom Ag were unjustly enriched through the alleged mislabeling scheme.  Custom Ag moves to dismiss the claim, arguing that it

is derivative of Diversified's other substantive claims and because Diversified's other claims fail, so too must this claim.

Although several of Diversified's other claims do fail, as discussed above, I have already ruled that its breach of warranty claims are sufficiently pleaded, so Custom Ag's argument that the unjust enrichment claim fails because all other claims fail is moot and its motion to dismiss as it relates to Count 11 will be denied.

12. <u>Indemnity (Count 12)</u>

In Count 12, Diversified seeks indemnity from all defendants, arguing that they caused the claims and damages Blue Buffalo has alleged against Diversified in this case. Diversified alleges that it is entitled to indemnity under two theories: implied-in-fact (or implied contractual indemnity), or, in the alternative, implied-in-law (equitable) indemnity.

*a) Implied-in-fact Indemnity*

Implied-in-fact contractual indemnity stems from the existence of a binding contract between two parties that necessarily implied the right of indemnification. The party asserting such indemnity must show that the parties to the contract "*intended* the indemnitor to be responsible for the loss." Thus, a claim of implied-in-fact indemnity asserts a contractual right to indemnity, even though no express contract for indemnity exists.

*Am. Nat. Prop. & Cas. Co. v. Ensz & Jester, P.C.*, 358 S.W.3d 75, 84 (Mo. Ct. App. 2011) (internal citations omitted).

William Haning, Oliver Harwell, and Henry Rychlik (the "Individual Wilbur-Ellis Defendants") move to dismiss the implied-in-fact indemnity claim as against them, arguing that Diversified fails to state a claim because no contract has been alleged between the Individual Wilbur-Ellis Defendants and Diversified. Diversified does not address this point in its response brief, and the Individual Wilbur-Ellis Defendants are correct that the complaint is devoid of any allegation that a contract exists between them and Diversified. *Carton*, 611 F.3d at 454. As a

result, Diversified has failed to state a claim for implied-in-fact indemnity against the Individual Wilbur-Ellis Defendants.

The Custom Ag Defendants also move to dismiss the implied-in-fact indemnity claim, arguing that Diversified has failed to plead any facts showing the parties intended there to be an indemnity provision in their contract. Indeed, the only allegation Diversified makes in regard to this element is that "The contracting parties intended that, in such a situation, Corporate Defendants would be responsible for any liability resulting from their wrongful conduct." [#525] at ¶ 147. Such conclusory allegations are insufficient to state a claim. *Iqbal*, 556 U.S. at 678. As a result, I will also dismiss Diversified's claim for implied-in-fact indemnity against the Custom Ag Defendants.

### b) Implied-in-Law Indemnity

In contrast to implied-in-fact indemnity, a claim for implied-in-law indemnity does not assert that a contractual right to indemnity exists. "[R]ather, such a party is asserting that, given the special nature of the case's circumstances, equity demands that one party indemnify the other." *Am. Nat. Prop. & Cas. Co. v. Ensz & Jester, P.C.*, 358 S.W.3d 75, 84 (Mo. Ct. App. 2011).

The Individual Wilbur-Ellis Defendants argue that Diversified has failed to state a claim for implied-in-law indemnity because Diversified has not alleged, and there is not, any special relationship between the parties or any other special circumstances justifying such equitable relief. Diversified contends that because it alleged that all defendants "knew or should have known that selling out-of-spec adulterated meal to Diversified" would damage its relationship with Blue Buffalo, it has sufficiently pleaded its claim.

Special relationships are typically found in an employer-employee, attorney-client, or agent-principal scheme, for example. In contrast, when a typical business relationship is alleged, courts generally find that there is no special relationship. *See, e.g., Best Buy Stores, L.P. v. Walters Acquisitions, Inc.*, No. 2:14-CV-04299-NKL, 2015 WL 545569, at *5 (W.D. Mo. Feb. 9, 2015).

Here, Diversified has not sufficiently alleged the existence of special circumstances or a special relationship between the Individual Wilbur-Ellis Defendants and itself. Nor is there any other basis in the complaint for concluding that such a relationship existed. Diversified is a sophisticated business entity; the Individual Wilbur-Ellis Defendants, in contrast, are individual employees. Moreover, Diversified has not alleged that the Individual Wilbur-Ellis Defendants made promises to or conducted business with Diversified in anything other than their capacities as officers or managers of Wilbur-Ellis. As a result, Diversified's claim for implied-in-law indemnity will be dismissed as against the Individual Wilbur-Ellis Defendants.

The Custom Ag Defendants also move to dismiss Diversified's claim for implied-in-fact indemnity, arguing that Diversified cannot plead this claim where it has already alleged that a contract exists. Diversified may, however, plead this theory in the alternative, which is precisely what it did, so this argument fails. *See* FRCP 8(d).

The Custom Ag Defendants also argue that the claim fails for lack of a special relationship or special circumstances requiring indemnification. Diversified's allegations against Custom Ag are far from robust, as it merely alleges the existence of a relationship between two sophisticated business entities. Unlike its claim against the Individual Wilbur-Ellis Defendants, who were merely employees, however, I cannot say that Diversified's claim for indemnity-in-law against Custom Ag fails as a matter of law. The special circumstances of the parties'

relationship as alleged throughout the Complaint allow me to draw the reasonable inference that equitable relief may be proper. I will, however, dismiss the claim for indemnity-in-law as against Troy Geraci for the same reasons I articulated above regarding the Individual Wilbur-Ellis Defendants. As a result, Diversified may maintain its claim for implied-in-law indemnity against Custom Ag but the claim will be dismissed as against Troy Geraci.

13. <u>Contribution (Count 13)</u>

In Count 13, Diversified brings a claim for contribution against all defendants, alleging that they "had a duty to exercise care regarding the supplying, manufacturing, labeling, selling, hauling, shipping, or brokering of materials and goods for or to Diversified, including to provide Diversified with chicken meal and turkey meal without animal byproducts and feathers as specified by Blue Buffalo, which is the subject of Blue Buffalo's Third-Party Complaint in this matter." [#525] at ¶ 155.

For a right to contribution to exist under Missouri law, defendants must be jointly and severally liable to the plaintiff for the same indivisible harm. *Gibson v. City of St. Louis*, 349 S.W.3d 460, 466 (Mo. Ct. App. 2011). "An indivisible injury results when two or more causes combine to produce an injury incapable of division on any reasonable basis and each is a substantial factor in bringing about the harm." *Id.* (internal citations omitted).

The Individual Wilbur-Ellis Defendants seek dismissal of the contribution claim, arguing that Diversified has failed to plead that they could be personally and directly liable to Blue Buffalo along with Diversified. While Diversified does allege that all defendants had a duty of care to provide goods to Diversified that conformed to Blue Buffalo's specifications, it never explains the basis for that allegation in regards to the Individual Wilbur-Ellis Defendants, as opposed to Wilbur-Ellis Company, whose alleged duty ostensibly arises from its contracts and

business relationship with Diversified. Nor does Diversified provide any support for its argument that the Individual Wilbur-Ellis Defendants owed a duty to it or Blue Buffalo in its opposition brief. At best, Diversified provides a conclusory allegation, and this is insufficient to survive the motion to dismiss. *Carton*, 611 F.3d at 454. As a result, Diversified's claim for contribution will be dismissed as against the Individual Wilbur-Ellis Defendants.

The Custom Ag Defendants also move to dismiss the claim for contribution, arguing that Diversified has failed to plead any facts that could make them directly liable to Blue Buffalo or Purina because neither Blue Buffalo nor Purina are alleged to have relied upon representations made by the Custom Ag Defendants. Specifically, the Custom Ag Defendants argue that Blue Buffalo and Purina could not have relied on the blend language that Diversified complains is misleading because there is no allegation that they ever saw or relied on that term. Although they don't specify the basis for their reliance argument, I assume the Custom Ag Defendants' argument about reliance refers to Diversified's claim for breach of implied warrant of fitness for a particular purpose. As discussed above, however, Diversified has stated a claim for breach of implied warranty of fitness for a particular purpose. Additionally, in its contribution claim, Diversified alleges that the Custom Ag Defendants had a duty to provide goods to Diversified that conformed to Blue Buffalo's specifications, of which all defendants knew, and that Diversified and Blue Buffalo were injured as a direct and proximate result of defendants' failure to provide conforming goods. Because elsewhere in the complaint Diversified alleges a proper basis from which Custom Ag's duty to provide conforming goods stems, I conclude that it has stated a claim for contribution against Custom Ag. I will, however, dismiss the claim for contribution as against Troy Geraci, who is not alleged to have personally contracted with Diversified for the allegedly nonconforming sales.

14. Severance

Finally, the Custom Ag Defendants ask me to sever and hold in abeyance any of Diversified's surviving claims so that they can be tried, if at all, only after a finding of liability against Diversified. I am going to reserve ruling on this issue as I am considering many strategies for how to best manage this case.

Accordingly,

**IT IS HEREBY ORDERED** that Wilbur-Ellis Company, William Haning, Oliver Harwell, and Henry Rychlik's motion to dismiss Diversified Ingredients' crossclaims #[508] is **GRANTED** in part and **DENIED** in part in accordance with the terms of this Memorandum and Order.

**IT IS FURTHER ORDERED** that Custom Ag Commodities, LLC and Troy Geraci's motion to dismiss Diversified Ingredients' third party claims #[557] is **GRANTED** in part and **DENIED** in part in accordance with the terms of this Memorandum and Order.

**IT IS FURTHER ORDERED** that Diversified Ingredients shall file an amended crossclaim and third-party complaint in accordance with the terms of this Memorandum and Order **no later than May 20, 2016**.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 19th day of April, 2016.