UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BLUE BUFFALO COMPANY, LTD.,   ) | |
|          ) | |
|       Plaintiff,          ) | |
|          ) | |
| v.                       ) | |
|          ) | Case No. 4:14 CV 859 RWS |
| WILBUR-ELLIS COMPANY,     ) | |
| LLC, et al.,              ) | |
|          ) | |
|       Defendants,       ) | |
|          ) | |
| AND RELATED ACTIONS      ) | |

## **MEMORANDUM AND ORDER**

Blue Buffalo and Wilbur-Ellis both filed objections to Special Master Bradley A. Winters's Omnibus Order No. 10.  In their briefs, the parties extensively debated whether Blue Buffalo waives attorney-client and work product privileges by offering employee testimony explaining why the company settled the Nestlé Purina and class action lawsuits ("the collateral lawsuits").  After hearing oral arguments on this issue on January 20, 2022, I ruled that the privilege motion was premature because at this stage, it is fundamentally based on a hypothetical.  I ordered that the parties begin depositions to explore the foundations of Blue Buffalo's employees' opinions.  I instructed the parties to file appropriate motions if it appears that that legal advice was solicited and provided the basis for a specific employee's opinion.  If this occurs, we will reconvene for another hearing.

There are three remaining issues from Omnibus Order No. 10 that I did not resolve at the hearing: (1) whether the allocation standard articulated in UnitedHealth Grp., Inc. v. Exec. Risk Spec. Ins. Co., 870 F.3d 856 (8th Cir. 2017) applies in this case; (2) whether Wilbur-Ellis must compile a privilege log of all documentation of its internal investigations into the adulteration and mislabeling scheme; and (3) whether Blue Buffalo must produce settlement communications from the collateral lawsuits.

## ANALYSIS

### I.    Allocation standard

Wilbur-Ellis argues that the United States Court of Appeals for the Eighth Circuit has clearly provided the allocation standard that should apply in this case.  It contends that this case and UnitedHealth are analogous; like Blue Buffalo, UnitedHealth settled several claims against it in other lawsuits and then sued its insurers to recover those settlement payments.  On appeal, the Eighth Circuit affirmed the trial court's ruling that UnitedHealth bore the burden of allocating the settlement between potentially covered claims and non-covered claims "with enough specificity to permit a reasoned judgment about liability."  870 F.3d at 863; see also United Health Group, Inc. v. Columbia Cas. Co., 47 F.Supp.3d 863, 873 (D. Minn. 2014) (concluding that UnitedHealth "bears the burden to prove how much of the [total settlement] should be allocated" to the potentially covered claim).  According

to Wilbur-Ellis, Blue Buffalo, as the party seeking recovery in this case, also bears the burden of proving what portion of the $64 million settlement payment was reasonably attributable to Wilbur-Ellis's alleged misconduct.

Blue Buffalo maintains that the UnitedHealth allocation standard "is a creature of Minnesota insurance law and the unique circumstances that case presented" that should not apply to the various state law and RICO claims in this case. Instead, Blue Buffalo believes it must only prove that Wilbur-Ellis's conduct was a "substantial factor" in causing its damages. Blue Buffalo cites two cases that purportedly support this "substantial factor" argument: Collier v. Manring, 309 S.W.3d 848 (Mo. Ct. App. 2010) and Rocky Mountain Festivals, Inc. v. Parsons Corp., 242 P.3d 1067 (Colo. 2010).

Again, I believe that this issue is premature. It is a question that is more appropriately addressed in a motion for summary judgment or a motion in limine.

II.     *Logging requirement*

In Omnibus Order No. 4, the Special Master ordered Wilbur-Ellis to respond to amended versions of Blue Buffalo's Interrogatories Nos. 1 and 2. ECF No. [1587 at 86-87]. Originally, the interrogatories stated:

1. Please identify all customers to whom You sold Poultry Products that were mislabeled, misbranded, adulterated, or deviated from customer specifications. Please include both direct customers and any customers to whom You sold indirectly through ingredient brokers or other entities, including Custom Ag.

2. For each customer identified in response to Interrogatory No. 1, please identify with regard to each shipment of Poultry Products that was mislabeled, misbranded, adulterated, or deviated from customer specifications: (a) the Poultry Products that the customer directly or indirectly ordered; (b) the ingredients present in the product that was provided to the customer; (c) the volume purchased; and (d) the price and total amount paid by the customer.

As amended by the Special Master, Interrogatory No. 1 asks Wilbur-Ellis to identify "customers to whom You or any of your agents, employees or contractors *knowingly* sold Poultry Products that were mislabeled, misbranded, adulterated, or deviated from customer specifications" (emphasis added).

In its response, Wilbur-Ellis listed "all customers that received mislabeled, misbranded, adulterated, or non-spec shipments – regardless of whether the mislabeling, misbranding, adulteration or deviation from specifications was done knowingly or not." The response also informed that "[g]iven the passage of time, and the fact that individuals directly involved in the sale of these shipments are no longer employed at Wilbur-Ellis," it would be impossible to answer the interrogatory as modified.

Finding this response deficient, Blue Buffalo asked the Special Master to order that Wilbur-Ellis answer the questions asked or alternatively compel Wilbur-Ellis to assert privilege over the results of its internal investigations into the adulteration and mislabeling scheme. ECF No. [1614 at 76].

In Omnibus Order No. 10, the Special Master found that Wilbur-Ellis had adequately answered Interrogatory No. 1.  He did "not question [Wilbur-Ellis's] representation that it cannot divine from documents or other sources the state of mind of employees involved in the alleged mislabeling scheme to which Doug Haning pled guilty," and acknowledged that he could not "compel a party to swear to something to which it assures me it cannot swear."  However, he granted Blue Buffalo's motion to compel Wilbur-Ellis to assert privilege, explaining:

> …Wilbur-Ellis's assertions about that lack/loss of state of mind information, about former employees with valuable knowledge who have moved on and about current employees without knowledge of past events, combine to suggest that investigations conducted in the 2014 time period may be the only source of information about what was known by Wilbur-Ellis when the alleged adulteration and mislabeling scheme was in full flower. These assertions are factors to consider in determining whether Blue Buffalo is entitled to Wilbur-Ellis['s] investigation reports prepared, and "confidential witness interviews" conducted, at or shortly after the product adulteration and mislabeling scheme in Wilbur-Ellis's Rosser, Texas facility was exposed. These assertions may alone be adequate grounds to justify production of those reports and statements. If memories of key events have been lost and witnesses have moved on, these reports and statements may now be the only record of material case facts. If so, their production is most likely warranted.

> Blue Buffalo also raises questions about internal investigations launched in 2014 and requests that I order Wilbur-Ellis to assert privilege over its internal investigations. Blue Buffalo believes that Wilbur-Ellis should produce a range of facially privileged documents because the "privilege does not protect facts communicated to an attorney."

Blue Buffalo's broad claim that the attorney-client "privilege does not protect facts communicated to an attorney" requires some qualification…

That said, if Wilbur-Ellis has not logged all internal investigations (including transcripts and summaries of "confidential witness interviews") of the alleged adulteration and mislabeling scheme as to which it asserts privilege, it must do so immediately.

**IT IS THEREFORE HEREBY ORDERED** that Blue Buffalo's motion to compel further responses to Interrogatory Nos. 1 and 2 is **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER HEREBY ORDERED** that Blue Buffalo's motion to compel Wilbur-Ellis to assert privilege and log all documentation of its internal investigations of the adulteration and mislabeling scheme is, to the extent Wilbur-Ellis has not done so already, **GRANTED.** For avoidance of doubt and for the reasons set forth on pages 80 and 81 above, this includes (a) all statements of fact witnesses taken by Wilbur-Ellis' counsel (including trial counsel) regarding the conduct/operation of the alleged adulteration and mislabeling scheme from 2011 to [2014] and (b) internal investigations that quote or paraphrase fact witness statements regarding the conduct/operation of the alleged adulteration and mislabeling scheme from 2011 to [2014]. The log for such statements shall state the name of the witness providing the information.

ECF No. [1614 at 80-83].

Wilbur-Ellis maintains that it never alleged that there are lost or unavailable facts in the work product of its trial counsel, and that the Special Master erred in accepting Blue Buffalo's characterization of the "passage of time" reference in its amended interrogatory response. Apparently, that statement was only intended to indicate that Wilbur-Ellis could not "conclusively state—to the level of certainty necessary for an under-oath interrogatory response—that its employees knowingly

mislabeled shipments (as opposed to the fact of mislabeling alone)."   ECF No. [1622-7 at 2].

I agree with Blue Buffalo and the Special Master's reading of Wilbur-Ellis's response.  It appears that Wilbur-Ellis has claimed that it lacks knowledge of, and the ability to acquire knowledge of, which employees intentionally participated in the adulteration and mislabeling scheme—despite the fact that, by its own admission, Wilbur-Ellis began conducting internal investigations in 2014 to identify the employees involved.[1]  As a result, it was appropriate for the Special Master to order the logging of documentation relating to those internal investigations. Omnibus Order No. 10 does not order the production of any potentially privileged documents, so the privilege claims that Wilbur-Ellis now raises about opinion versus ordinary work product are premature.  Those challenges can and should be addressed after the Special Master's *in camera* review.

### III.    Settlement communications from the collateral lawsuits

Wilbur-Ellis requested production of settlement communications between Blue Buffalo's counsel and opposing counsel in the Nestlé Purina and class action lawsuits.  In addressing this request, the Special Master discussed Federal Rule of Evidence 408(a)(2), which provides that "statement[s] made during compromise

---

[1] Furthermore, as I reminded the parties during the hearing, Wilbur-Ellis is no doubt familiar with the employees who entered guilty pleas for their involvement in the scheme.

negotiations about the claim" are "not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction," and the confidentiality agreement executed by Blue Buffalo and Nestlé Purina during their mediation.   He acknowledged that neither source is dispositive of this issue and ultimately denied Wilbur-Ellis's motion to compel production of the communications, reasoning:

> Federal Rule 408(a)(2) is a rule of admissibility, not discoverability, but it nonetheless informs part of my ruling.
>
> The classic justification for Rule 408(a)(2) is that it promotes candid settlement discussions by assuring (e.g.) that a business owner's ability to defend the condition of his/her premises is not undercut by a sincere effort to compromise the claim of an injured patron. But all settlement communications suffer from the same limitation in that they "may be motivated by a desire for peace rather than from any concession of weakness of position." Settlement communications with opposing counsel offer little if any reliable evidence of the wisdom, reasonableness or motivations of complex case settlements – especially settlements with valued customers (as was the case in the class actions) and with aggressive competitors threatening serious damage to a party's core marketing messages (as was the case in the Nestlé Purina litigation). Business and goodwill motivations, strawman arguments and general posturing make such communications dubious sources of reliable evidence in "proving [anything other than] a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."
>
> This issue is further complicated by a confidentiality agreement executed by Blue Buffalo and Nestlé Purina during their mediation…
>
> …This confidentiality agreement is not binding on the Court or the CSM, but the openness it facilitated, the confidentiality it promised and the parties' reliance on it are nonetheless entitled to some consideration in this analysis.

> I believe that in this case, settlement communications between Blue Buffalo's counsel and opposing counsel in the Underlying Litigation will offer little if any benefit in the determination of the reasonableness and proper allocation of the settlement amounts paid in those cases. I believe their production risks significant prejudice and damage to candid settlement communications. And I believe that the aforesaid prejudice and damage far outweigh any benefit from production of settlement communications not referenced in the Joint Submission.

ECF No. [1614 at 40-42].

In its objection, Wilbur-Ellis argues that the Special Master applied the correct legal analysis but reached the wrong conclusion.  Wilbur-Ellis contends that the communications it seeks are not privileged and argues that their production is necessary and relevant, as they could reveal whether the collateral lawsuits were settled for reasons other than product adulteration.

In response, Blue Buffalo argues that ordering production of the requested communications will "impact the rights of all other parties to the settlements and the mediator," which is unfair because the parties involved operated "under the expectation that [the communications] would remain confidential and would not be available in any subsequent proceeding."  Furthermore, Blue Buffalo believes that the communications will offer little value to Wilbur-Ellis's case since Wilbur-Ellis already has the evidence that it needs to cross-examine Blue Buffalo witnesses about the company's reasons for settling.  Finally, Blue Buffalo asks me to consider

adopting the mediation privilege that some circuit courts have recognized, but maintains that I need not do so to overrule this part of Wilbur-Ellis's objection.

This is a close question. Wilbur-Ellis is correct: Blue Buffalo has put this issue into contention with its assertion that it settled all of the collateral lawsuits because of Wilbur-Ellis's wrongdoing. The Special Master is also correct that the communications may not contain any relevant information, given the general nature of settlement discussions. And I take seriously Blue Buffalo's point that the parties involved believed that their communications would remain confidential. However, I am not prepared to prevent the communications from being disclosed altogether at this stage, since the settlements themselves raise issues that the jury will have to consider. Therefore, Blue Buffalo must produce the communications for the Special Master's *in camera* review. If the communications contain statements relevant to the allocation issue, the Special Master must then determine whether the probative value of their production outweighs any prejudicial effect to Blue Buffalo and other involved parties.

Accordingly,

**IT IS HEREBY ORDERED that** Wilbur-Ellis's objection to Omnibus Order No. 10, [1624], is **OVERRULED** with respect to the logging requirement.

**IT IS FURTHER ORDERED that** Blue Buffalo shall produce the requested settlement communications for the Special Master's *in camera* review within 30 days of the issuance of this order.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 1st day of February, 2022.