UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BLUE BUFFALO COMPANY, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 4:14 CV 859 RWS |
| WILBUR-ELLIS COMPANY LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Before the Court are numerous motions in limine and cross-motions for partial summary judgment filed by plaintiff Blue Buffalo and defendant Wilbur-Ellis in anticipation of the jury trial set to begin June 4, 2024.  Having carefully reviewed the arguments of the parties set out in the motions, supporting and opposing memoranda, as well as all proffered exhibits, I issue the following rulings upon application of the legal standards stated below.  Given the complex and lengthy procedural history of this litigation, I assume the parties' familiarity with the underlying facts and issues in this case and do not restate them, except as necessary to address the arguments of the parties or the expert opinions at issue here.

Because many of the issues raised by Wilbur-Ellis in its motion for partial summary judgment impact the pending motions in limine, those arguments are addressed, where appropriate, within the respective rulings on the motions in limine.

The remaining issues raised by Wilbur-Ellis in its motion for partial summary

judgment will be ruled by separate Memorandum and Order.

## Legal Standards Governing the Introduction of Expert Testimony

The introduction of expert testimony is governed by Federal Rule of

Evidence, recently amended effective December 1, 2023.  Rule 702 currently

provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Given the dearth of caselaw interpreting the amended rule, the

Court sets out the Advisory Committee note to the Rule in full, which explains:

> Rule 702 has been amended in two respects:
>
> (1) First, the rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule.  *See* Rule 104(a).  This is the preponderance of the evidence standard that applies to most of the admissibility requirements set forth in the evidence rules.  *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("The preponderance standard ensures that before admitting evidence, the court will have found it more

2

likely than not that the technical issues and policy concerns addressed by the
Federal Rules of Evidence have been afforded due consideration.");
*Huddleston v. United States*, 485 U.S. 681, 687 n.5 (1988) ("preliminary
factual findings under Rule 104(a) are subject to the preponderance-of-the-
evidence standard").  But many courts have held that the critical questions of
the sufficiency of an expert's basis, and the application of the expert's
methodology, are questions of weight and not admissibility.  These rulings are
an incorrect application of Rules 702 and 104(a).

There is no intent to raise any negative inference regarding the applicability of
the Rule 104(a) standard of proof for other rules.  The Committee concluded
that emphasizing the preponderance standard in Rule 702 specifically was
made necessary by the courts that have failed to apply correctly the reliability
requirements of that rule.  Nor does the amendment require that the court
make a finding of reliability in the absence of objection.

The amendment clarifies that the preponderance standard applies to the three
reliability-based requirements added in 2000--requirements that many courts
have incorrectly determined to be governed by the more permissive Rule
104(b) standard. But it remains the case that other admissibility requirements
in the rule (such as that the expert must be qualified and the expert's testimony
must help the trier of fact) are governed by the Rule 104(a) standard as well.
Some challenges to expert testimony will raise matters of weight rather than
admissibility even under the Rule 104(a) standard.  For example, if the court
finds it more likely than not that an expert has a sufficient basis to support an
opinion, the fact that the expert has not read every single study that exists will
raise a question of weight and not admissibility.  But this does not mean, as
certain courts have held, that arguments about the sufficiency of an expert's
basis always go to weight and not admissibility.  Rather it means that once the
court has found it more likely than not that the admissibility requirement has
been met, any attack by the opponent will go only to the weight of the
evidence.

It will often occur that experts come to different conclusions based on
contested sets of facts. Where that is so, the Rule 104(a) standard does not
necessarily require exclusion of either side's experts. Rather, by deciding the
disputed facts, the jury can decide which side's experts to credit.
"[P]roponents 'do not have to demonstrate to the judge by a preponderance of
the evidence that the assessments of their experts are correct, they only have
to demonstrate by a preponderance of evidence that their opinions are

reliable... The evidentiary requirement of reliability is lower than the merits standard of correctness."' Advisory Committee Note to the 2000 amendment to Rule 702, quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994).

Rule 702 requires that the expert's knowledge "help" the trier of fact to understand the evidence or to determine a fact in issue. Unfortunately, some courts have required the expert's testimony to "appreciably help" the trier of fact. Applying a higher standard than helpfulness to otherwise reliable expert testimony is unnecessarily strict.

(2) Rule 702(d) has also been amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology. Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

The amendment is especially pertinent to the testimony of forensic experts in both criminal and civil cases. Forensic experts should avoid assertions of absolute or one hundred percent certainty--or to a reasonable degree of scientific certainty--if the methodology is subjective and thus potentially subject to error. In deciding whether to admit forensic expert testimony, the judge should (where possible) receive an estimate of the known or potential rate of error of the methodology employed, based (where appropriate) on studies that reflect how often the method produces accurate results. Expert opinion testimony regarding the weight of feature comparison evidence (i.e., evidence that a set of features corresponds between two examined items) must be limited to those inferences that can reasonably be drawn from a reliable application of the principles and methods. This amendment does not, however, bar testimony that comports with substantive law requiring opinions to a particular degree of certainty.

Nothing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702. Similarly, nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The

4

> Rule 104(a) standard does not require perfection. On the other hand, it does
> not permit the expert to make claims that are unsupported by the expert's
> basis and methodology.

Fed. R. Evid. 702 Advisory Committee Notes (2023 Amendment). "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.*

"Rule 702's screening requirement has been boiled down to a three-part test. First, the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant. Second, the expert must be qualified to assist the finder of fact. Third, the testimony must be reliable or trustworthy in an evidentiary sense." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021) (cleaned up).

As to the first requirement, an expert's opinion lacks relevance if it does not fit the facts of the case. *McMahon v. Robert Bosch Tool Corp.*, 5 F.4th 900, 903 (8th Cir. 2021). On the other hand, "Rule 702 is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'" *United States v. Perry*, 61 F.4th 603, 606 (8th Cir. 2023) (quoting *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006)). As to the second requirement, a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Fed.

5

R. Evid. 702.  Thus, an expert is qualified if, for example, her degrees and training gave her competence for the subject area of her testimony.  *Perry*, 61 F.4th at 606.  "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility," and "the weight given to witness testimony is the province of the jury."  *Id.* (cleaned up).  Third, the testimony must be reliable.  *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993) (A district court must ensure that testimony admitted under Rule 702 "is not only relevant, but reliable.").

When making the reliability determination, a court may evaluate whether the expert's method has been tested or subjected to peer review and publication, the method's known or potential rate of error, and the method's general acceptance. *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94). These factors are not exhaustive, and a court must evaluate the reliability of expert testimony based on the facts of the case.  *Id.*  A court also may consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (cleaned up).  When weighing these factors, a district court must function as a gatekeeper to separate "expert opinion

6

evidence based on good grounds from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (cleaned up).  Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006), such that the testimony is "so fundamentally unsupported that it can offer no assistance to the jury." *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (cleaned up).  But disputes about the factual basis of an expert's testimony ordinarily implicate the credibility— not the admissibility—of the testimony.[1]  *Sappington*, 512 F.3d at 450; *see also Minn. Supply Co.*, 472 F.3d at 544.

Due to the liberalization of expert testimony admission standards signaled by *Daubert* and its progeny, and the codification of this trend in Rule 702, the Eighth Circuit has held that expert testimony should be liberally admitted.  *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) ("*Daubert* and Rule 702 thus greatly liberalized what had been the strict . . . standards for admission of expert scientific testimony.").  As long as the expert testimony "rests upon good grounds, based on what is known, it should be tested by the adversary process with competing

---

[1] Given that the Eighth Circuit already applied the preponderance of the evidence standard to determine the admissibility of expert testimony, *see Lauzon v. Senco Prods., Inc*., 270 F.3d 681, 686 (8th Cir. 2001), the Court sees no conflict in this line of authority and Rule 702 as amended and will continue to apply it as the binding law of this Circuit.

expert testimony and cross-examination, rather than excluded by the court at the outset." *Id.* (cleaned up). The exclusion of expert testimony is proper "only if it is so fundamentally unsupported that it can offer no assistance to the jury." *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997) (cleaned up).

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001); Fed. R. Evid. 702. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admission over exclusion. *Lauzon*, 270 F.3d at 686 (cleaned up). The determination as to the admissibility of expert testimony is within a district court's sound discretion. *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997).

## Legal Standards Governing Summary Judgment

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011). The Court must view the evidence in the light most favorable to the nonmoving party and accord him the benefit of all reasonable inferences. *Scott v. Harris,* 550 U.S. 372, 379 (2007). The Court's function is not to weigh the evidence but to determine whether there is

a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the burden of informing the Court of the basis of its motion and demonstrating the absence of an issue for trial.  *Celotex Corp.*, 477 U.S. at 323.  Once a motion is properly made and supported, the nonmoving party must either proffer evidence in the record that demonstrates a genuine issue of material fact or show that the moving party's proffer does not establish the absence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248; *Conseco Life Ins. Co. v. Williams,* 620 F.3d 902, 910 (8th Cir. 2010); *Howard v. Columbia Pub. Sch. Dist.,* 363 F.3d 797, 800-01 (8th Cir. 2004).  The substantive law determines which facts are critical and which are irrelevant.  *Anderson*, 477 U.S. at 248.  Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Id.*

In determining a motion for summary judgment, The Court considers only those facts that can be supported by admissible evidence.  Fed. R. Civ. P. 56(c); *Woods v. Wills*, 400 F. Supp. 2d 1145, 1175-76 (E.D. Mo. 2005).  Testimony that would not be admissible is ignored.  *Shaver v. Independent Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003).  Under these standards the Court review the pending motions.

## Rulings on Motions in Limine

**ECF 1798** – Blue Buffalo's Motion to Exclude Jeffrey Buchakjian's Opinions Regarding Poultry Meal Volumes from 2009 through 2012 – **DENIED**

Jeffrey Buchakjian is Wilbur-Ellis's accounting expert who offers opinions about how much poultry meal Blue Buffalo purchased from Darling Ingredients. The testimony is being offered by Wilbur-Ellis to show that much of Blue Buffalo's adulterated ingredients came from Darling, not Wilbur-Ellis, so the amount of damages that can be attributed to Wilbur-Ellis should be reduced by Darling's share.

In its motion in limine, Blue Buffalo seeks to exclude Buchakjian's testimony about how much poultry meal Blue Buffalo purchased from Darling between 2009 and 2012. Blue Buffalo admits that it did not keep per-supplier volume records for its products from 2009 through 2012, but it did for later years. Where the actual numbers were available Buchakjian used them in his calculations. Blue Buffalo argues the testimony should be excluded because the actual volume data is not available so his testimony is therefore unreliable. Blue Buffalo also challenges his testimony as unreliable for failing to account for other suppliers during the relevant period.

Wilbur-Ellis responds that Buchakjian's testimony is helpful and reliable because it is based upon factual assumptions that are supported by other evidence in the record, including testimony from Blue Buffalo executives and other suppliers regarding Darling's market share at the time. Buchakjian testified that it is a routine

10

part of his job as a forensic accountant to extrapolate data in this manner, and he applied two different sets of assumptions for the years in question based on the facts of the case.

While it is true that Buchakjian's testimony regarding the amount of poultry meal volumes Blue Buffalo purchased from Darling from 2009 through 2012 is not based on the same type of facts used for later years (ie., records of the amount actually purchased), it is not correct to state that the testimony for these years is based on *no* facts or such insufficient facts or data that the opinion is so fundamentally unsupported that it can offer no assistance to the jury. Although data showing actual volumes purchased does not exist for this period, Buchakjian based his testimony on other facts from the record, including testimony from Blue Buffalo that Wilbur-Ellis and Darling were Blue Buffalo's two main suppliers. Buchakjian's estimates varied based on years and suppliers, and was not simply a one-size-fits-all estimate unconnected to the facts in the record. Buchakjian relied on his training and expertise as a forensic investigator to identify the best-available evidence to estimate the volume of Darling-supplied meal during the relevant periods, and performing such estimates is something he is typically asked to do and within his area of expertise. Blue Buffalo does not challenge his qualifications as an expert.

Under these circumstances, the Court finds by a preponderance of the evidence that Buchakjian's opinions regarding the amount of poultry meal volumes

Blue Buffalo purchased from Darling from 2009 through 2012 meet the threshold standard for admissibility under Rule 702.   The factual basis for Buchakjian's testimony, including his failure to consider other identified suppliers of poultry meal, goes to the credibility of his testimony and is certainly fodder for vigorous cross-examination.  It is not, however, under these circumstances a basis to exclude the testimony as inadmissible.

Accordingly,

**IT IS HEREBY ORDERED** that the motion  in limine [1798] is denied.

**ECF 1816** – Blue Buffalo's Motion to Exclude Evidence of Lab Manufactured Poultry Meals – **GRANTED**

Dr. John Fessler is Wilbur-Ellis's mechanical engineer who opines that Darling's proprietary process[2] for refining poultry meal could not separate out poultry byproduct meal in part because his testing shows that particles of poultry meal and poultry byproduct meal are too similar in size and density to separate.[3] Wilbur-Ellis relies on Fessler to argue that Darling also sent Blue Buffalo byproduct

---

[2] Darling claims it had a proprietary process for refining poultry meal that utilized an air classification machine and a series of sieve screens to separate poultry meal particles of different sizes and densities. Darling has maintained throughout this litigation that its proprietary process could separate aspects of poultry byproduct meal from poultry meal and that this process produced poultry meals that satisfied Blue Buffalo's specifications.

[3] The opinions which are the subject of the instant motion appear in the record at ECF 1814-6 at 18-25.

meal and should also be responsible for Blue Buffalo's damages.

Dr. Charles Starkey ran a science lab at Auburn University in the summer of 2017 when he was an Assistant Professor in the Department of Poultry Science. Starkey was hired to create poultry meal for Wilbur-Ellis to give to Fessler for use in this case.[4]  More than one hundred students, mostly undergraduates, worked in the lab and helped created the Starkey meal.  There is no dispute that Starkey's process is not the same as the commercial process used to create poultry meal and that the meal created by Starkey produced meals vastly different in size and density than the commercially available poultry meal at issue in this case.  Starkey may have provided guidance on how to create the meal, but his students did not follow his instructions and changed his process in numerous, material ways.   Instead of using a coffee grinder to process the meal, for instance, the students often resorted to a food processer.  The students also made undocumented, subjective decisions that altered the meal they created, such as grinding it until it looked like "brown sugar".  Both would directly affect the resulting meals' particle size.  The students did not document which specific processes were applied to the final meals shipped for analysis to Fessler.  With the exception of some handwritten notes, there are no

---

[4] Starkey was asked to create "three small batches of rendered poultry that were made from: 1) 100% meal components (cages and thigh bones); 2) 100% byproduct components (15% heads, 15% feet and 70% viscera pack, i.e., intestines, liver, pancreas, stomach and gizzard), or; 3) a 50%/50% mix of meal and byproduct components."  ECF 1814-6 at 20 (cleaned up).

records of what the students did, such as photographs, videos, or logs. The students even destroyed all of the meals they made which were not sent to Fessler.

In its motion in limine, Blue Buffalo argues that Fessler's testimony which relies on the Starkey meals should be excluded as not relevant or helpful since the Starkey meals do not resemble commercial meals in any respect and therefore any opinions based on tests performed with the Starkey meals are likewise not relevant or helpful.  Also, the testimony should be excluded because the methods used to produce the Starkey meals are not reliable under Rule 702.

Wilbur-Ellis argues that these tests are superfluous because Fessler showed that Darling's "air classification system" could not work in other ways that did not depend on the tests he ran with Starkey's meal and those opinions are not the subject of the instant motion in *limine*.  Wilbur-Ellis also argues that the motion should be denied as moot[5] because it believes the Court is going to grant its motion for partial summary judgment on the issue of whether Darling provided byproduct meal to Blue Buffalo.  It is not.  It will be for the jury to decide whether Darling supplied Blue Buffalo with byproduct meal.

In its motion for partial summary judgment, Wilbur-Ellis argues that there is no dispute that Darling supplied Blue Buffalo with mislabeled and adulterated

---

[5] The only way this motion becomes moot is if Wilbur-Ellis concedes that it is not going to introduce this evidence, which it has not done.

shipments containing byproduct meal.  These arguments are found in Section D of its brief.  ECF 1820-1 at 46-58.  In making this argument, Wilbur-Ellis points to the evidence it has marshaled, including Fessler's testimony, in support of its position that Darling did not, and could not, separate poultry meal from poultry byproduct meal with its proprietary process for refining poultry meal.   However, in arguing for judgment as a matter of law Wilbur-Ellis has ignored the ample evidence which also exists in the record from which a reasonable jury could conclude that Darling was *not* responsible for Blue Buffalo's damages in this case.

Darling, unlike Wilbur-Ellis, never pleaded guilty to such criminal conduct, and Darling's fact witnesses have testified that Darling produced meal which always met Blue Buffalo's specifications.  The Court is not empowered to weigh competing evidence to determine which version of the facts is more likely, and Wilbur-Ellis is not entitled to judgment as a matter of law simply because Blue Buffalo offers no expert testimony on Darling's proprietary process.  Blue Buffalo may properly rely on other evidence, including the testimony of fact witnesses, to support its position that Wilbur-Ellis -- and only Wilbur-Ellis -- sold it adulterated and misbranded byproduct meal.  Although Wilbur-Ellis may believe that its version of the facts is more persuasive because it relies upon expert testimony, the issue of whether Darling sold Blue Buffalo byproduct meal relies upon credibility determinations which rests solely within the province of the jury.  Wilbur-Ellis's

partial motion for summary judgment on the issue of whether Darling provided byproduct meal to Blue Buffalo as a matter of law is denied.

To the extent John Fessler's opinions rely on poultry meals manufactured by Charles Starkey, they are not relevant or helpful to this case because Starkey's process for creating poultry meal in a lab did not follow industry standards, it was not similar to the process actually used to produce the products at issue, and it produced meals vastly different in size and density than the commercially available poultry meal at issue in this case.

Moreover, Starkey's process used to create the poultry meal does not satisfy Rule 702's reliability standard because: it cannot be tested or verified, and the students working under Starkey's direction routinely deviated from the process in numerous ways without his knowledge and failed to adequately document the changes and the samples produced from such changes; it has not been subject to peer review and publication; there is no known potential rate of error; and, his methods are not utilized in the industry at issue in this case. There is no evidence that experts in Fessler's field would reasonably rely upon this type of evidence in formulating opinions about commercial grade poultry meal. As a result, Starkey's poultry meal evidence is unreliable, and any opinions based upon that evidence must be excluded.

Accordingly,

**IT IS HEREBY ORDERED** that the motion in limine [1816] is granted, and

expert testimony and argument pertaining to Charles Starkey's lab-manufactured poultry meals is excluded from trial for all purposes, and expert testimony and argument pertaining to John Fessler's analysis of the lab-manufactured poultry meals is excluded from trial for all purposes, including those opinions set out in Sections 3.5, 3.5.1, 3.5.2, and 3.5.3 of John Fessler's, January 23, 2023 Expert Report, which can be found in the record as ECF 1814-6 at pages 18 through 25.

**ECF 1803**- Wilbur-Ellis's Motion to Exclude Testimony of Edward Robertson, Jr. Regarding the Purina Lawsuit – **DENIED**

Former Missouri Supreme Court Judge Edward Robertson, Jr. is one of Blue Buffalo's legal experts.  He will offer an opinion about how much of the $32 million in damages Blue Buffalo paid to settle the *Purina* litigation was based upon Wilbur-Ellis's conduct.  According to Judge Robertson, Wilbur-Ellis's conduct was responsible for all $32 million paid by Blue Buffalo to settle the claims.  Judge Robertson also opines that Blue Buffalo's settlement with Purina was "reasonable" because there was no dispute that Blue Buffalo's products contained mislabeled byproduct meal from Wilbur-Ellis, Purina disclosed large damages figures in its initial Rule 26 disclosures, and Purina's case "centered nearly exclusively on the chicken and turkey byproduct meal allegation,"  as opposed to the other allegations of false advertising, such as the "superior nutrition" claims.

In its motion in limine, Wilbur-Ellis claims that Judge Robertson is not

qualified to render an opinion because he is not a "Lanham Act Litigator," and that he does not apply the "controlling" law set out in *UnitedHealth Group, Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856 (8th Cir. 2017). Wilbur-Ellis also argues that Judge Robertson gives improper rebuttal testimony and "interprets" test results, which is beyond his purview as a lawyer.

Blue Buffalo argues that Judge Robertson is qualified to render his opinions as he does not need to be a "Lanham Act Litigator" to have the relevant experience to opine on the *Purina* suit, which contained only two Lanham Act claims. Moreover, Blue Buffalo contends that his opinion should not be excluded under *UnitedHealth* because that opinion is not controlling here, and even if it were, Judge Robertson allocates 100 percent responsibility to Wilbur-Ellis, which is not improper. Finally, Blue Buffalo argues that Judge Robertson's rebuttals are necessary to rebut the opinions of Wilbur-Ellis's expert James Bennett. Judge Robertson opines on the areas raised first by Bennett, including whether he failed to consider relevant evidence in assessing Blue Buffalo's exposure for "superior nutrition" claims. He also rebuts Bennett's opinion that there was no testing to support Blue Buffalo's advertising. Finally, Blue Buffalo contends that Judge Robertson does not attempt to interpret the results of the ORAC testing as argued by Blue Buffalo. Instead, he notes its existence to rebut Bennett's opinion that there was no testing.

Since *UnitedHealth* was decided, Wilbur-Ellis has repeatedly insisted that it (and only it) governs this case and requires Blue Buffalo to "allocate" its settlement damages in the *Purina* case between those caused by Wilbur-Ellis and those caused by other liabilities based upon how a reasonable litigant in its position would have assessed its relative exposure at the time of settlement.  Wilbur-Ellis has filed a motion for partial summary judgment on this issue, and the argument relating to *UnitedHealth* is found in Section C.1.3 of its brief.  ECF 1820-1 at 28-37.  According to Wilbur-Ellis, *UnitedHealth* requires Blue Buffalo to retain an attorney[6] as an expert to perform a relative exposure analysis of the settled liabilities, and Blue Buffalo's refusal to do so means that it has no non-speculative, triable basis for its damages.

In *UnitedHealth*, plaintiff UnitedHealth settled two lawsuits and then sued its insurers to recover those settlement payments under its various insurance policies.  870 F.3d at 859.  There was potential insurance coverage for claims in one lawsuit but not for the other.  *Id.*  On appeal, the Eighth Circuit affirmed the trial court's ruling that UnitedHealth bore the burden of allocating the settlement between potentially covered claims and non-covered claims "with enough specificity to permit a reasoned judgment about liability."  870 F.3d at 863.  The Eighth Circuit concluded that "the Minnesota Supreme Court would place the

---

[6] Not just any attorney, according to Wilbur-Ellis, but specifically a "Lanham Act Litigator."

burden on the insured to allocate between covered and non-covered claims." *Id.* at

862 (cleaned up); *see also UnitedHealth Group, Inc. v. Columbia Cas. Co.*, 47 F.

Supp. 3d 863, 873 (D. Minn. 2014) (concluding that UnitedHealth "bears the

burden to prove how much of the [total settlement] should be allocated" to the

potentially covered claim).  This was so because "under Minnesota law

UnitedHealth bears the burden to allocate the settlement between the potentially

covered and non-covered suit with enough specificity to permit a reasoned

judgment about liability." *UnitedHealth*, 870 F.3d at 863.  The insurance policy

also required UnitedHealth to allocate between covered and non-covered claims.

*Id.* at 862.

According to Wilbur-Ellis, *UnitedHealth* requires Blue Buffalo to prove

what portion of the $64 million settlement payment was reasonably attributable to

Wilbur-Ellis's alleged misconduct.  Having duly considered the issue, the Court

concludes that *UnitedHealth* does not control this case.

Blue Buffalo does not bring any claims for contractual indemnity under any

insurance or other type of contract in this case, let alone one governed by

Minnesota law.  Instead, Blue Buffalo brings three tort claims under Texas law for

fraud, negligence, and civil conspiracy; a RICO claim, governed by federal law;

three warranty claims under Missouri law; two claims for equitable relief (unjust

enrichment and e*quitable* – as opposed to contractual -- indemnification); and, a

20

statutory claim brought under CUTPA.  ECF 1524.  *UnitedHealth* does not purport to address any of these types of claims, and the Court will not extrapolate this decision to apply here in the absence of any controlling authority dictating such a result.[7]  Here, there is not even persuasive authority applying this decision to require such an allocation outside of a contractual indemnification claim.[8]  Blue Buffalo was not required to comply with the dictates of *UnitedHealth* to provide a non-speculative, triable basis for its damages, so Wilbur-Ellis's motion for partial summary judgment on that ground is denied.

For this reason, Judge Robertson's testimony regarding the *Purina* lawsuit is relevant to the issues to this case and will be helpful to the jury, and the Court will not exclude it simply because he did not apply *United Health* to the facts here. Moreover, Judge Robertson does not have to be a "Lanham Act Litigator" to render

---

[7] The Eighth Circuit recently reinforced that *UnitedHealth* applied Minnesota law in *ResCap Liquidating Trust v. Primary Residential Mortgage, Inc*., 59 F.4th 905, 918 (8th Cir. 2023).

[8] *UnitedHealth* has been cited 67 times, including twice in decisions issued by this Court in this case.  64 of those cases are from this circuit, and this Court has reviewed each one.  Only 14 of those cases cited *UnitedHealth* for its allocation analysis.  Of those, most (10) involve application of Minnesota law.  All of those cases, however, involved claims for contractual indemnity.  The remaining cases cite *UnitedHealth* either for the standards governing summary judgment and/or evidentiary rulings.  None of these cases involve application of *UnitedHealth* to the type of claims brought by Blue Buffalo against Wilbur-Ellis in this case.

In making their arguments, the parties have not distinguished Blue Buffalo's claim for equitable indemnification from the others.  Therefore, in the absence of any authorities applying *UnitedHealth* to a claim for equitable (as opposed to contractual) contribution, the Court likewise declines to apply it here.

him qualified to opine about the *Purina* lawsuit, as the underlying *Purina* case involved many claims other than the two Lanham Act claims, and Judge Robertson has significant experience with those claims as well as Missouri false advertising and consumer protection claims, which are similar to Lanham Act claims.

Finally, the Court finds nothing improper about Judge Robertson's rebuttals given the opinions of Bennett. Judge Robertson properly opines on the areas raised by Bennett, including whether he failed to consider relevant evidence in assessing Blue Buffalo's exposure for "superior nutrition" claims. He also offers testimony to rebut Bennett's opinion that there was no testing to support Blue Buffalo's advertising. These are proper points of rebuttal. Contrary to Wilbur-Ellis's argument, Judge Robertson does not attempt to interpret the results of the ORAC testing; instead, he merely notes its existence to rebut Bennett's opinion that there was *no* testing.

Judge Robertson and Bennett's testimony present the classic battle of the experts. The basis for Judge Robertson's opinions regarding Wilbur-Ellis's responsibility for Blue Buffalo's damages is certainly subject to vigorous cross-examination, just as is Bennett's opinion that the *Purina* settlement related primarily to "superior nutrition" advertising. That the two experts reach different conclusions is no reason for the Court to exclude the testimony of either.

Accordingly,

**IT IS HEREBY ORDERED** that the motion [1803] is denied.

**ECF 1808**- Wilbur-Ellis's Motion to Exclude the Testimony of Edward Robertson, Jr. and Booker T. Shaw as to Attorneys' Fees – **DENIED**

Judge Robertson and former Missouri Court of Appeals Court Judge Booker T. Shaw are Blue Buffalo's expert witnesses on the amount of legal fees expended by Blue Buffalo in the *Purina* and class action lawsuits and underlying criminal investigation, which Blue Buffalo seeks to recover as damages in this case.  Both opine that all of the $18.4 million in fees Blue Buffalo spent in those cases were reasonable and necessary and should be attributed to Wilbur-Ellis as damages in this case.[9]

In its motion in limine, Wilbur-Ellis seeks to exclude their opinions because they did not seek to undertake which fees were directly attributable to the conduct of Wilbur-Ellis.  Both judges opine that all fees should be attributed to Wilbur-Ellis because Blue Buffalo would not have been sued at all but for the byproduct meal provided by Wilbur-Ellis.  Wilbur-Ellis argues that this testimony is also improper "state of mind" evidence.  Finally, Wilbur-Ellis argues that their testimony that the legal fees were paid is evidence that they were reasonable impermissibly instructs the jury on the law.  Wilbur-Ellis offers its own expert on the amount of legal fees

---

[9] Wilbur-Ellis does not dispute that Blue Buffalo's entitlement to $1.7 million of those fees attributable to the class action case should be submitted to the jury.  ECF 1820-1 at 37 n.1.

attributable to Wilbur-Ellis.

Wilbur-Ellis also moves for partial summary judgment on this issue. ECF 1820-1 at 37-45. In its motion, Wilbur-Ellis contends that Blue Buffalo was required to allocate which fees in the *Purina* and criminal litigation were attributable to Wilbur-Ellis's conduct (as opposed to those fees incurred by Blue Buffalo in defending against Purina's advertising claims unrelated to byproduct meal), and because it did not it has therefore failed to provide a non-speculative basis upon which to recover any attorneys' fees as damages. Wilbur-Ellis also argues that Blue Buffalo impermissibly seeks fees associated with its claims against Wilbur-Ellis and Diversified.

Blue Buffalo asserts that it is entitled to attorneys' fees as compensatory damages under Texas law on its tort claims, under Missouri law on its warranty claims, under Connecticut law on its CUPTA claim, and under federal law on its RICO claim. Blue Buffalo responds that it is entitled to seek its attorneys' fees expended in the *Purina* and other cases as damages because it would not have incurred those fees but for the misconduct of Wilbur-Ellis, and it is not required to segregate which fees incurred in those third-party actions can be attributed directly to the misconduct of Wilbur-Ellis. Instead, Blue Buffalo contends that it will be up to a jury to decide whether and how much to award as damages, including its request for attorneys' fees as damages.

Whether attorneys' fees are recoverable as compensatory damages in a breach of warranty claim in Missouri or in a RICO or CUPTA claim has not been adequately addressed by either party.  However, these damages may only be recovered (if at all) once, and the parties have adequately addressed the issue with respect to Blue Buffalo's tort claims, which are governed by Texas law.  Therefore, if Texas law would permit recovery of attorneys' fees as damages in Blue Buffalo's tort claims in the manner presented by Blue Buffalo, then Wilbur-Ellis's motion for summary judgment on this point must be denied, whether or not these damages may be alternatively recovered under one or more of the additional causes of action.

In Texas, unless expressly provided for by statute or by contract, attorneys' fees incurred in the defense or prosecution of a lawsuit are generally not recoverable. *Turner v. Turner*, 385 S.W.2d 230, 233 (Tex. 1964).  Despite this rule, a plaintiff may recover attorneys' fees as damages if the defendant's wrongful act forces the plaintiff to litigate and protect itself in a third party lawsuit.  *Id.* at 234; *Great Am. Ins. Co. v. AFS/IBEX Fin. Servs.*, 612 F.3d 800, 808 (5th Cir. 2010).  This provision "is limited to situations where the natural and proximate results and consequences of prior wrongful acts had been to involve a plaintiff . . . in litigation." *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 251 (5th Cir. 2014) (quoting *DP Sols, Inc. v. Rollins, Inc.*, 353 F.3d 421, 431 (5th Cir. 2003)).  To recover attorneys' fees as damages, the plaintiff must have incurred the fees in a prior action, and the

prior action must have been against a third party and not the defendant in the present case. *Turner*, 385 S.W.2d at 234.[10]

Wilbur-Ellis concedes that the *Purina* lawsuit and resulting criminal investigation are a "prior actions" involving a third party for purposes of application of the doctrine.  ECF 1820-1 at 39.  And Blue Buffalo affirms that it does not seek fees from the present action against Wilbur-Ellis.  ECF 1848 at 19.  Because Blue Buffalo contends that it was forced into litigation in those prior actions due to the misconduct of Wilbur-Ellis, it appears that under Texas law Blue Buffalo may seek attorneys' fees as part of its damages in connection with its tort claims.

Nevertheless, Wilbur-Ellis contends that because these prior actions involved matters and litigation unrelated to Wilbur-Ellis, Blue Buffalo is not entitled to recover any of these fees because it did not specify which fees related directly to

---

[10] Some Texas appellate courts disagree on the recoverability of attorneys' fees as damages, s*ee Martin–Simon v. Womack,* 68 S.W.3d 793, 797–98 (Tex.App.2001) ("Under various circumstances, some of our sister courts of appeals have adopted an equitable exception to the general rule of non-recovery of attorney's fees in tort cases. However, neither the Texas Supreme Court nor this court has adopted any exception to this rule and we decline to do so in this case.") (cleaned up), and the Texas Supreme Court has not yet expressly resolved the conflict. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 119 (Tex. 2009) ("We need not and do not address whether the litigation exception should be adopted as Texas law") (cleaned up),   However, the Fifth Circuit Court of Appeals has decided that the Texas Supreme Court would adopt the exception.  *See Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 251 (5th Cir. 2014); *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 430–31 (5th Cir. 2003).  This Court finds persuasive the reasoning of the Fifth Circuit and adopts it here in the absence of the any controlling authority to the contrary.

Wilbur-Ellis's conduct.  In support of its argument, Wilbur-Ellis relies on *Dixon Financial Services, Ltd. v. Chang*, 325 S.W.3d 668, 678-80 (Tx. Ct. App. 2010). After acknowledging the application of the equitable exception permitting the recovery of attorneys' fees as damages, the appellate court concluded that a party was nevertheless not entitled to recovery of attorneys' fees as damages as a matter of law because the party did not present competent evidence that it had sustained the claimed damages.  *Id.* at 678.  In particular, the court concluded that an attorney's affidavit averring that fees were incurred in a prior litigation was insufficient as a matter of law to demonstrate that those fees were incurred in prior litigation involving a *third party*, rather than in connection with the pending action.  *Id.*  That case is inapposite here where there is no dispute that the *Purina* case and criminal investigation involved third parties.

As stated above, Blue Buffalo has stated that it is not seeking its fees in this case.[11]  However, Wilbur-Ellis argues that Blue Buffalo is entitled to *no* fees as a matter of law because Blue Buffalo's fee request includes litigation unrelated to Wilbur-Ellis.  Texas courts have permitted recovery of attorneys' fees incurred in

---

[11] Blue Buffalo's fee request appears to include several entries which may be related to its pursual of claims against Wilbur-Ellis, contrary to this representation.  Although the Court concludes that Blue Buffalo is not precluded from seeking attorneys' fees as damages here, recovery of fees incurred in the present action are plainly precluded under any variation of the so-called collateral litigation doctrine and Blue Buffalo knows it.  The Court expects the expert testimony and evidence to comply with the law and the representations of counsel in this brief and withdraw any fee request inconsistent with either, as it is *not* the jury's job to parse the evidence in such a manner.

prior actions due to the wrongful conduct of a tortfeasor without segregation where the fees "are so intertwined and enmeshed as to be incapable of any meaningful, realistic segregation." *Texas Beef Cattle Co. v. Green*, 883 S.W.2d 415, 430 (Tex. Ct. App. 1994), *rev'd on other grounds*, 921 S.W.2d 203 (Tex. 1996). Through the expert testimony of Judges Robertson and Shaw, Blue Buffalo maintains just that -- that its fees in those prior actions cannot be segregated.

While the Court appreciates Wilbur-Ellis's position that Blue Buffalo overreaches in its damages assessment, that potential misstep goes only to the amount, not the availability, of an award and does not preclude recovery *in toto* of attorneys' fees as damages. Instead, it will be up to a jury to decide whether Blue Buffalo should be awarded any attorneys' fees as damages after full consideration of all the evidence, including evidence which may contradict and undermine the opinion of Blue Buffalo's experts.[12]

Judges Robertson and Shaw offer relevant and admissible testimony as to Blue Buffalo's claimed damages, which here include attorneys' fees, and their testimony that the fees were incurred solely because of Wilbur-Ellis's conduct is not improper "state of mind" evidence or contrary to Texas law. While their opinions

---

[12] However, the Court may reconsider the issue of fees sought to the extent they relate to the instant, not collateral, litigation if Blue Buffalo asserts its entitlement to those fees at trial. Such a determination would be made, if appropriate, during trial, *not before*.

that all of Blue Buffalo's legal fees should be attributed to Wilbur-Ellis will be subject to vigorous cross-examination, there is nothing about that testimony which invades the province of the jury or otherwise renders it inadmissible. Nor is testimony that payment of legal fees may be evidence of their reasonableness an impermissible opinion which invades the province of the Court or the jury on an ultimate issue. Instead, the challenged opinions offered by the judges are just opposite sides of the same coin of opinions offered by Wilbur-Ellis's experts, and they cannot be excluded simply because they are not in agreement with Wilbur-Ellis's experts as to the amount of fees that may be recovered as damages by Blue Buffalo in this case. It will be up to the jury, not this Court, to decide this issue after consideration of all the evidence, including that of the testifying experts.

Accordingly,

**IT IS HEREBY ORDERED** that the motion [1808] is denied.


**ECF 1802-** Blue Buffalo's Motion to Exclude Customer Survey and Advertisement Interpretation Opinions of Wilbur-Ellis's Proffered Expert James F. Bennett – **DENIED**

Attorney Jim Bennett is one of Wilbur-Ellis's legal experts who proposes to testify about the appropriate allocation of settlement dollars in the P*urina* and consumer class action lawsuits, which Blue Buffalo settled for $32 million each. Bennett reviewed advertising materials and consumer surveys conducted by Blue

Buffalo to conclude that the "superior nutrition" advertising claim is material to consumer purchase decisions and that the "no by-product" advertising claim is not. Based on this conclusion, he opines that a reasonable allocation of the remaining settlement amounts was 70% to the "superior nutrition" claim and 30% to the "no by-products" claim. According to Bennett, this results in $18.3 million allocated to Blue Buffalo's potential liability for the "no by-products" claim.

Blue Buffalo argues that Bennett's opinions should be excluded because he does not possess the requisite experience and qualifications to interpret Blue Buffalo's consumer surveys and printed materials on Blue Buffalo's packaging. Blue Buffalo argues that Bennett has never offered testimony interpreting consumer surveys in the past; he is not a social scientist, survey expert, or consumer marketing expert; he has no training in interpreting consumer surveys or in assessing consumer perceptions; and, he retains expert witnesses in the matters he litigates.

Wilbur-Ellis claims that *United Health* requires expert testimony from a qualified attorney as to how a reasonable party in that party's position would have valued the various settled liabilities based on what the party knew at the time of settlement. Wilbur-Ellis claims that Bennett approached the questions as if he were providing advice to Blue Buffalo as its outside counsel at the times of settlements, and based his opinion solely on the evidence that would have been available to Blue Buffalo at those times, which included Blue Buffalo's annual consumer surveys.

Bennett's testimony regarding the underlying *Purina* lawsuit and consumer class action lawsuits is relevant to the issues in this case and will be helpful to the jury, and the Court will not exclude it.  Bennett has significant experience in Lanham Act and false advertising litigation, and he is offering his opinions about the value of the consumer surveys and advertisements not as a social scientist but as a trial lawyer who would consider this and other information available to Blue Buffalo in connection with his determination of the settlement value of the case as a whole.

Blue Buffalo's complaints about Bennett's testimony go to the weight of his testimony rather than its admissibility.  The utility of these surveys and advertisements to the valuation of the case, as well as the other factual underpinnings, assumptions, and methodology used by Bennett to reach his conclusions, will all be subject to vigorous cross-examination at trial.  It will be up to the jury, not this Court, to weigh the credibility of Bennett's testimony and consideration of all the evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the motion [1802] is denied.

**ECF 1813** – Wilbur-Ellis's Motion to Exclude Dr. Ruth Corbin - **DENIED**

Dr. Ruth Corbin is a social scientist retained by Blue Buffalo to testify that the consumer surveys and advertisements relied upon by Bennett do not actually support

his conclusions because, among other things, Bennett relies on one question alone to formulate his opinion, he injects his own personal opinion about the definition of the term superior, he improperly applies a hierarchy of reasoning that is not supported by the survey, he misapplies the purpose of the surveys (which sought information about consumer attitudes, not purchase decisions), he makes assumptions unsupported by the data, and fails to account for other relevant factors.

Wilbur-Ellis moves to exclude this evidence as irrelevant because it argues that Corbin is not "an American lawyer," so she cannot testify what an "American lawyer" would do with this evidence.

Given the Court's decision to permit Bennett to testify that he based his opinions regarding Blue Buffalo's exposure for "superior nutrition" claims on (among other things) consumer surveys and advertisements, the Court will likewise permit Corbin, a qualified social scientist, to testify that the consumer surveys and advertisements considered by Bennett do not actually support his conclusions.  This testimony is relevant and helpful to the jury as it will assist them in evaluating Bennett's credibility as well as the weight to assign his testimony.

Accordingly,

**IT IS HEREBY ORDERED** that the motion [1813] is denied.

## **Blue Buffalo's Motion for Partial Summary Judgment**
## **ECF 1819 – GRANTED**

Blue Buffalo's motion seeks partial summary judgment on two issues: the law which is to apply to its tort claims; and, whether the conduct of one of Wilbur-Ellis's agents should be imputed to Wilbur-Ellis.

Blue Buffalo's motion that Texas law applies to its tort claims brought against Wilbur-Ellis is granted as unopposed. *See* ECF 1863 at 5 n.1 ("Wilbur-Ellis agrees that Texas law applies . . . [and] does not oppose the application of Texas law to Blue Buffalo's tort claims).[13]

Blue Buffalo also asks this Court to find that William "Doug" Haning was a "vice principal" of Wilbur-Ellis, thereby imputing his conduct to Wilbur-Ellis as a matter of Texas law with respect to its tort claims. "In Texas, '[w]hen actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself.'" *Century Surety Company v. Seidel*, 893 F.3d 328, 337 (5th Cir. 2018) (quoting *Bennett v. Reynolds*, 315 S.W.3d 867, 883 (Tex. 2010)). "[A] vice-principal includes four classes of human agents: (a) Corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of

---

[13] Five of Blue Buffalo's 12 claims against Wilbur-Ellis are tort claims. Blue Buffalo also brings three warranty claims, two claims for equitable relief, and claims under the civil RICO statute and the Connecticut Unfair Trade Practices Act. ECF 1524.

the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business." *Bennett,* 315 S.W.3d at 884. A vice-principal is established if the corporation's agent "used corporate authority over corporate employees, on corporate land, to [commit a tort] using corporate equipment." *Id.* at 885. "'A vice-principal represents the corporation in its corporate capacity, and includes persons who have authority to employ, direct, and discharge servants of the master, and those to whom a master has confided the management of the whole or a department or division of his business.'" *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 253 (Tex. 2009) (quoting *GTE Sw., Inc. v. Bruce,* 998 S.W.2d 605, 618 (Tex.1999)). "'As vice-principals, their acts are the acts of the corporation itself, and corporate liability in this situation is direct rather than vicarious.'" *Chrysler*, 297 S.W.3d at 253 (quoting *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 391 (Tex.1997)).

The genesis of this lawsuit nearly a decade ago spurred (among other things) a criminal investigation into the mislabeling and adulteration of pet food products through the use of byproduct and feather meal. The resulting criminal prosecution ultimately led to numerous parties, including Wilbur-Ellis and its employees Henry Rychlik and Haning, pleading guilty to offenses associated with the misbranding of pet food products sold to Wilbur-Ellis customers, including Blue Buffalo. Those guilty pleas were made in this Court (Case Numbers 4:17 CR 100 and 4: 18 CR

139).  The guilty plea agreements include binding stipulations of fact which may not be controverted now.

As relevant here, on April 25, 2018, Wilbur-Ellis pled guilty to the introduction of adulterated food into interstate commerce, in violation of Title 21, United States Code, Sections 331(a), 333(a)(1).  Wilbur-Ellis's guilty plea agreement related to its provision of "adulterated and misbranded interstate shipments" which "originated from the WILBUR-ELLIS facility in Rosser, Texas."  Wilbur-Ellis admitted that the predicate acts for its guilty plea were committed by "corporate agents and employees that were acting within the course and scope of their duties."

On August 9, 2018, Rychlik pled guilty to the introduction of misbranded food and the introduction of adulterated food, in violation of Title 21, United States Code, Sections 331(a), 333(a)(1).  As admitted in his plea agreement, by avoiding the identification of products shipped from Wilbur-Ellis's Texas facility as a blend in shipping documents, Rychlik and others were able to conceal the actual ingredients contained in the products shipped, such as feather meal and by-products, and secure, maintain, and grow business for Wilbur-Ellis that would otherwise have been unavailable.  Because certain products shipped from Wilbur-Ellis's Texas facility were not identified as a blend and the actual ingredients were concealed, the recipients of those products— including six of Blue Buffalo's co-

manufacturing facilities—accepted shipments they would not have otherwise accepted but for the misrepresentations.  Rychlik affirmed under oath that his misconduct, which occurred at the facility in Texas, was "within the course and scope of his duties and employment" at Wilbur-Ellis.  Rychlik's plea agreement states as follows:

> [He] worked as the Quality Assurance Manager at the Rosser facility when it was owned by ABP. After the Rosser facility was acquired by Wilbur-Ellis, the defendant continued to work at WE-Rosser as the Site Manager. **At all relevant times, Defendant Rychlik reported to, was supervised by, and worked under the management and direction of Doug Haning and others. Specifically, Doug Haning, and others, authorized and directed the blending conducted and executed by Defendant Rychlik to fulfill sales orders shipped interstate from the Rosser facility and authorized, directed and agreed to the manner those shipments were identified, branded and labelled.**

Case Number 4: 17 CR 100 at ECF 124 (emphasis supplied).   Rychlik still works for Wilbur-Ellis.

On October 24, 2019, Haning pled guilty to money laundering in violation of Title 18, United States Code, Section 1957, and conspiracy in violation of Title 21, United States Code, Sections 331(a), 333(a)(2).  Haning affirmed under oath that his misconduct, which all occurred at the facility in Rosser, Texas, was "within the course and scope of his duties and employment at Wilbur-Ellis."  Haning's guilty plea contains the following "Stipulated Facts Specific to Wilbur-Ellis and Defendant Haning's Position at Wilbur-Ellis":

American By-Products ("ABP") was a Texas corporation located in Rosser, Texas and Dallas, Texas. ABP was a protein blender for the pet food industry that emphasized marketing chicken meal and chicken by-product meal. ABP's blending facility in Rosser, Texas ("ABP Rosser") was not a rendering facility.  Instead, ABP-Rosser purchased its raw poultry materials from rendering facilities and based its business model on its ability to grind, screen, classify, blend, and stabilize animal proteins that needed to be processed. ABP owners and shareholders included Haning and other Haning family members.

Wilbur-Ellis Company ("Wilbur-Ellis"), a California LLC with headquarters in San Francisco, California, was an international marketer and distributor of agricultural products, animal feed, and specialty chemicals and ingredients, among other products, and operated in the States of Texas and Washington and elsewhere.

On or about April 2011, Wilbur-Ellis purchased the assets of ABP, specifically the blending facility in Rosser, Texas.  **Prior to the acquisition, ABP owner Haning, and others were in charge of buying and selling the food ingredients blended at ABP-Rosser. Haning also managed the logistics, the marketing of products, and maintained the relationships with the customer and supplier base for the business.  Haning continued in his sales and management role at WE-Rosser after Wilbur-Ellis purchased the assets of ABP and continued to be responsible for buying the food ingredients blended at the Rosser facility and selling the products shipped from the Rosser facility. As part of the acquisition, Haning entered into an employment agreement with Wilbur- Ellis as Operations Manager of the Rosser branch of Wilbur-Ellis. The provisions of the Employment Agreement and the Asset Purchase Agreement specified that, in addition to a salary and any applicable bonus he received as a Wilbur-Ellis officer and manager, Haning** and his family would be entitled to one or more deferred payments in an amount up to $9,000,000 if WE-Rosser's profitability remained consistent with the profitability of ABP-Rosser and met the yearly earn-out targets projected by Wilbur-Ellis.

The Feed Division of Wilbur-Ellis marketed and distributed products and ingredients for use in the pet food industry including, but not limited to, animal proteins used in the manufacture of dog food and cat food. After April 2011, Wilbur Ellis' Feed Division included the facility in Rosser, Texas that, between 2011 and 2014, supplied multiple pet food companies and pet food manufacturers with animal protein products and ingredients including chicken, turkey, pork and fish protein products and ingredients. Through its marketers in the Feed Division, including but not limited to Haning, Wilbur-Ellis sold food ingredients for use in pet food products. Those sales included both direct sales by Wilbur-Ellis to pet food companies and manufacturers, and sales by Wilbur-Ellis conducted through one or more intermediaries, including brokers, distributors and traders, located in the Eastern District of Missouri and elsewhere.

Diversified Ingredients, Inc. ("Diversified Ingredients") is a Missouri corporation located in Ballwin, Missouri, within the Eastern District of Missouri. Diversified Ingredients is a commodities broker and distributor whose customers include a number of pet food companies and manufacturers. From 2008 through 2014 and thereafter, Diversified Ingredients brokered and distributed pet food products and ingredients from the facility in Rosser, Texas.

Custom AG Commodities, LLC ("Custom AG") is a Texas company (and sole proprietorship) established on or about April 2011, with a physical address in Winnsboro, Texas and a mailing address in Sulphur Springs, Texas. Custom AG served primarily to facilitate transactions involving Wilbur-Ellis' newly acquired facility in Rosser, Texas ("WE-Rosser") and Diversified Ingredients.

**For the benefit of Wilbur-Ellis, Haning and others, and as part of Haning's employment related duties at Wilbur-Ellis's Rosser, Texas facility, the methods of adulteration and misbranding of food supplied interstate from Rosser, Texas to pet food manufacturers, as executed by Defendant Doug Haning and others, involved and included the omission of the raw material ingredient and the substitution, in whole or in part, of by-product meal for premium pet food products and ingredients by-product meal was introduced and caused to be introduced into**

38

> **interstate commerce by Haning and others.  The adulterated shipments of food received by Pet Food Manufacturers were introduced and caused to be introduced into interstate commerce by Haning and others.**
>
> **The adulterated food products and ingredients that Haning and others, shipped and caused to be shipped from the facility in Rosser, Texas, were mislabeled and misbranded.**

ECF 1833-4 (cleaned up and emphasis supplied).  Any arguments from Wilbur-Ellis that attempt to contradict or undermine the validity of these conclusively established facts are summarily rejected.[14]

In addition to the foregoing uncontroverted material facts respecting Haning's position and role with Wilbur-Ellis, Blue Buffalo also points out that: Haning's job title with Wilbur-Ellis was changed to "Business Unit Manager" in 2013 (ECF 1825-1 at 2); Haning testified that Wilbur-Ellis gave him the authority to hire personnel (ECF 1825-5 at 3); Rychlik testified Haning "had the authority to fire" him (ECF 1824-4 at 8); Aaron Williams testified Haning was "responsible for getting [him] the job at Rosser" (ECF 1825-4 at 3); and, Thomas "Ollie" Harwell testified Haning forced him to leave his employment at Rosser in 2013 (ECF 1825-3 at 3-4).

Having presided over this case since its inception as well as Haning's criminal case, and after full consideration of the uncontroverted facts in light of the

---

[14] Wilbur-Ellis complains that it cannot be bound by another's admissions.  In so doing, it misses the salient point: these facts are established by admissions made under oath from the employees with direct knowledge of Haning's role at the Rosser plant, and Wilbur-Ellis offers no evidence to contradict them.

foregoing Texas authorities, the Court concludes that Haning is a "vice principal" as a matter of law such that his conduct is attributable to Wilbur-Ellis in this case. Wilbur-Ellis's attempts to recast Haning as "nothing more" than a sales manager fall flat in light of: Haning's admissions to this Court that he "continued in his sales and management role at WE-Rosser after Wilbur-Ellis purchased the assets of ABP and continued to be responsible for buying the food ingredients blended at the Rosser facility and selling the products shipped from the Rosser facility;" and, Rychlik's admissions that he, as the site manager at WE-Rosser, "reported to, was supervised by, and worked under the management and direction of Doug Haning" and that "specifically, Doug Haning authorized and directed the blending conducted and executed by Defendant Rychlik to fulfill sales orders shipped interstate from the Rosser facility and authorized, directed and agreed to the manner those shipments were identified, branded and labelled." Stated otherwise, Haning "used [his] corporate authority over [Rychlik], [at WE-Rosser] to [adulterate and mislabel shipments] using [Wilbur-Ellis] equipment." *Bennett,* 315 S.W.3d at 885.  Wilbur-Ellis cannot dispute that Haning also had the authority to hire and fire employees, even if he lacked the authority to hire and fire *all* employees at the Rosser plant.  Finally, although Wilbur-Ellis may argue that the title "Business Unit Manager" did not "really" mean that Haning was a corporate

manager or officer, there is no dispute that under the relevant Texas authorities he is a vice principal. *See, e.g. id.*

Accordingly,

**IT IS HEREBY ORDERED** that Blue Buffalo's motion for partial summary judgment [1819] is granted, Texas law applies to Blue Buffalo's tort claims, and Doug Haning is deemed to be a vice principal of Wilbur-Ellis under Texas law with respect to Blue Buffalo's tort claims.

### Wilbur-Ellis's Motion for Partial Summary Judgment
### ECF 1823 – DENIED IN PART, GRANTED IN PART, STILL PENDING

Wilbur-Ellis seeks partial summary judgment on several legal and factual issues in this case. For the reasons set forth above,

**IT IS HEREBY ORDERED** that Wilbur-Ellis's motion for partial summary judgment [1823] is denied to the extent it argues: Blue Buffalo cannot recover damages attributable to the *Purina* lawsuit because it failed to comply with *UnitedHealth*; Blue Buffalo cannot recover its attorneys' fees attributable to the *Purina* case because it failed to properly identify those fees for which it was responsible; and, Darling supplied poultry byproduct meal to Blue Buffalo as a matter of law.

**IT IS FURTHER ORDERED** that Wilbur-Ellis's motion for partial summary judgment [1823] is granted only to the extent that Blue Buffalo concedes

that it is not seeking damages for lost profits, loss of consumer goodwill, or damages based upon Wilbur-Ellis's gains.

**IT IS FURTHER ORDERED** that Wilbur-Ellis's motion for partial summary judgment [1823] remains pending to the extent that it seeks summary judgment on Blue Buffalo's  RICO, CUPTA, equitable indemnity, and breach of an implied warranty of fitness for a particular purpose claims.  A separate Memorandum and Order will rule these remaining issues.

### Miscellaneous Rulings

**IT IS FURTHER ORDERED** that the motion for hearing [1841] is denied as moot.

**IT IS FURTHER ORDERED** that the provisional leave to file any documents and exhibits containing confidential information under seal without first filing a motion for leave to file under seal in accordance with the local rule, granted in the September 8, 2023 Memorandum and Order [1840], is **rescinded** as of the date of this Memorandum and Order.

**IT IS FURTHER ORDERED** that that this case will be referred to alternative dispute resolution in accordance with the accompanying Order.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 10th day of January, 2024.

42